**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **MARK ALIQUO**, **KEVIN BRYANT**, and **TIMOTHY LACY**, on behalf of themselves and all others similarly situated, | ) ) ) ) | CLASS ACTION COMPLAINT JURY TRIAL DEMANDED |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 1:18-cv-18 |
| **HCC MEDICAL INSURANCE SERVICES, LLC**, **HCC LIFE INSURANCE COMPANY**, and **HEALTH INSURANCE INNOVATIONS, INC.**, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**CLASS ACTION COMPLAINT**

Plaintiffs Mark Aliquo, Kevin Bryant, and Timothy Lacy ("Plaintiffs"), on behalf of themselves and all others similarly situated, individually and as class representatives, bring this multi-state class action against defendants HCC Medical Insurance Services, LLC and HCC Life Insurance Company (collectively, "HCC") and Health Insurance Innovations, Inc. ("HII"). Plaintiffs' allegations are based upon information and belief, except for the allegations concerning Plaintiffs' own actions.

**I.    NATURE OF THE ACTION**

1.    This is a class action against HCC and HII (collectively, "Defendants"), seeking declaratory and injunctive relief, equitable relief, and damages.  Defendants engage is a uniform and fraudulent course of conduct, and they knowingly breach contracts in a uniform manner.

2.    Defendants promise policyholders one thing and actually provide the opposite. They commit to providing short-term medical insurance with a pre-existing condition exclusion as short as *six months* and only as long as two years, and to promptly paying any claims arising during the period of coverage during a period as short as one month.  Defendants never do this. Instead, Defendants engage in a fraudulent and unlawful "five-year look-back" at policyholder

medical records, in an effort to either: (1) locate a pre-existing condition well beyond the contracted-to period, and use that condition as the basis to deny a valid claim; or (2) locate a medical condition that would have made the policyholder ineligible for Defendants' insurance in the first place, a practice known as "post-claims underwriting."  When Defendants cannot locate either a pre-existing or disqualifying condition, they instead claim they are in need of difficult to obtain and legally irrelevant medical records and/or pretend not to have medical records already in their possession, in an effort to delay policyholder claims to the point of constructive denial. This conduct, and the enterprise through which it operates, violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq*., the law of contract in each state in the multi-state classes, and the state statutory and common law of the states where the named plaintiffs and class representatives reside.

## II.   PARTIES

3.      Defendant HCC Medical Insurance Services, LLC ("HCCMIS") is a limited liability company established in 1998, with its headquarters at 251 North Illinois Street, Suite 600, Indianapolis, Indiana 46204.  HCCMIS was acquired by Tokio Marine Holdings, LLC in 2015.  According to its website, HCC is regulated by the State of Indiana as a Third Party Administrator.  HCCMIS writes insurance policies on behalf of HCC Life Insurance Company.

4.      Defendant HCC Life Insurance Company ("HCC Life") is a subsidiary of Tokio Marine Holdings, LLC and has its principal place of business at 225 TownPark Drive, Suite 350 Kennesaw, Georgia 30144.  HCC Life is the underwriter of HCC's short-term insurance policies complained of herein.

5.      Defendant Health Insurance Innovations, Inc. ("HII") is a publicly traded Delaware corporation, with its corporate headquarters at 15438 N. Florida Avenue #201, Tampa, Florida 33613.  HII has been selling health insurance contracts since 2008.

6.      Plaintiff Mark Aliquo is a United States citizen, domiciled in South Portland, Maine.  He contracted with HCC for a short-term insurance policy beginning April 2016, which continued through October 2016.

2

7.      Plaintiff Kevin Bryant is a United States citizen, domiciled in Box Elder, South Dakota.  He contracted with HCC for a short-term insurance policy beginning January 2017, which continued through July 2017.

8.      Plaintiff Tim Lacy is a United States citizen, domiciled in Post Falls, Idaho.  He contracted with HCC for a short-term insurance policy beginning May 17, 2016, which continued through November 16, 2016.

## III.   JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendants are of diverse citizenship, and pursuant to 28 U.S.C. § 1332(d)(2), because this is a class action in which the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs; there are at least one hundred (100) class members; and at least two-thirds of the members of the putative classes are citizens of a state other than Defendants' state(s) of citizenship.  This Court also has federal question jurisdiction under 28 U.S.C. § 1331, ancillary jurisdiction over any state law claims under 28 U.S.C. § 1367, and jurisdiction based on RICO, 18 U.S.C. § 1965(a).

10.     This Court has personal jurisdiction over HCC because it has conducted systematic and continuous business activities in and throughout the State of Indiana and has its principal place of business there.

11.     This Court has personal jurisdiction over HII because it has conducted systematic and continuous business activities in and throughout the State of Indiana.

12.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 because Defendants conduct business in Indiana, and because a substantial portion of the events giving rise to these claims occurred in this District, including the events related to Plaintiffs' claims.  Venue is also appropriate in this District pursuant to 18 U.S.C. § 1965.

## IV.   FACTUAL ALLEGATIONS

### A.   Short-Term Medical Insurance

13.     This case concerns short-term medical ("STM" or "short-term") insurance plans.

Short-term insurance provides limited coverage, is targeted to particularly vulnerable buyers, and is exempt from the consumer protections contained in the federal Patient Protection and Affordable Care Act ("ACA").  Those protections include the ACA's prohibition on discrimination based on pre-existing conditions, its prohibition on annual and lifetime limits, its requirement that policies contain certain minimum benefits, and its requirement that insurers return to policyholders, in claims payments, at least 80% of the premiums they collect.  Because short-term insurance provides such limited coverage, those who purchase it, like those who purchase no coverage at all, are subject to a tax penalty under the ACA.

14.     Notwithstanding its deficiencies, Plaintiffs do not challenge the sale or administration of short-term insurance in ways that comply with the law.  But Defendants' marketing and claims processing procedures are purposely engineered and uniformly applied to accomplish the delay and denial of valid claims, rendering their short-term insurance products effectively worthless and violating federal and state law in the process.

**B.     Defendants' Unlawful Marketing, Sale, and Administration of Short-Term Medical Insurance**

15.     Defendant HCC has historically been the largest short-term insurer in the nation. HCC contracts with policyholders to provide Defendants' STM products and underwrites the STMs through HCC Life.

16.     Defendant HII is a Third Party Administrator ("TPA") that solicits insurers, like HCC, to underwrite STMs and then organizes an operation of insurance brokers to sell those STMs.  HII engages in the administration of some STMs by, for example, providing billing services and operating the online portal through which policyholders may access their policy documents.

17.     Defendants began jointly developing, marketing, selling, and administering HCC's short-term insurance plans in July 2013, at the latest.[1]

---

[1] *See* HII Press Release, *Health Insurance Innovations Partners With HCC Like Insurance Company to Expand Short-Term Medical Portfolio*, (Jun. 3, 2013), available at

18.     Defendants develop, market, sell, and administer HCC's short-term insurance plans in at least 45 states, including Idaho, Maine, and South Dakota.[2]

19.     Defendants systematically fail to comply with the legal requirements to which they are subject, robbing policyholders of the services Defendants are legally obligated to deliver.  Specifically, Defendants violate the law through employing an undisclosed and unlawful "five-year look-back," through which they: (1) extend their pre-existing conditions exclusion well beyond the contracted-to period of six, twelve, or twenty-four months, in search of a condition to use as the basis to deny a valid claim; (2) engage in post-claims underwriting, in search of a condition that would have made the policyholder ineligible for Defendants' insurance in the first place; and (3) delay policyholder claims to the point of constructive denial, by claiming they are constantly in need of difficult to obtain and legally irrelevant medical records and/or by pretending not to have medical records already in their possession.

### 1.     Defendants' "Five-Year Look-Back"

20.     Defendants systematically exclude coverage or delay payment through employing a "five-year look-back" at the medical records of any policyholder who submits a claim.

21.     When a policyholder submits a claim, Defendants first require the policyholder to submit a "proof of loss form" to receive payment on the claim.  Defendants then require policyholders to submit **five years** of medical records.

22.     This five-year look-back practice is not disclosed to prospective purchasers of HCC's insurance.  Rather, the first time that policyholders are informed of the five-year look-back is at a time when they are especially vulnerable, having just suffered from the distress of a recent hospitalization or other medical incident.

### a.     Breach of Contract

23.     Defendants' five-year look-back violates the terms of HCC's contract with

---

http://investor.hiiquote.com/releasedetail.cfm?ReleaseID=775244 ("HII's new short-term medical plan with HCC is being launched in 45 states and will enhance our national presence by providing a competitive product that meets the needs of today's consumers.").
[2] *See supra* n.1.

policyholders.

24.     In the "Exclusions" section of the STM, Defendants disclose a pre-existing condition exclusion of six, twelve, or twenty-four months.  For example, Plaintiff Lacy's policy read as follows, in pertinent part:

> Charges for the following treatments and/or services and/or supplies and/or conditions are excluded from coverage:
>
> 1. Pre-existing Conditions – Charges from a condition for which a Covered Person received medical advice, diagnosis, care or treatment **within the six-month period immediately preceding such person's Effective Date** are excluded for the first 12 months of coverage hereunder.

(Emphasis supplied.)

25.     In the "Claim Provisions" part of the STM, Defendants further represent that benefits will be paid out in a timely manner.  For example, Plaintiff Bryant's policy read as follows, in pertinent part: "Benefits for loss covered by this policy will be paid **as soon as we receive proper written proof** of such loss."  (Emphasis supplied.)

26.     In practice, however, Defendants fail to abide by these contract provisions. Instead, Defendants search policyholders' medical records for evidence of any preexisting condition during a much longer, undisclosed time period—**the previous five years**—and deny policyholder claims based on medical conditions suffered well before the disclosed period. Defendants' request for five years of medical records therefore directly contravenes HCC's contracts with policyholders, which excludes coverage only for conditions for which the policyholder received medical treatment, diagnosis, care, or advice within a shorter window— **six, twelve, or twenty-four months**—preceding the effective date of coverage.

### b.     Post-Claims Underwriting

27.     When Defendants obtain medical records from policyholders through the five-year look-back, they use these records to seek out purported medical conditions that would have made the policyholder ineligible for HCC's insurance in the first place.  Once such a condition is

found, Defendants use it to justify denial of the policyholder's claim or the complete rescission of the policy.  This practice is commonly known as "post-claims underwriting."

28.     Certain states, recognizing the categorical problems associated with post-claims underwriting, have made the practice unlawful per se (even when disclosed).  As implemented by Defendants, post-claims underwriting is also fraudulent and a breach of HCC's contract with policyholders because Defendants intentionally and systematically fail to disclose that they employ the practice, and use the practice as a vehicle to fraudulently deny claims, actually or constructively.

### c.     <u>Fraudulent Claims Handling</u>

29.      Defendants' claims handling procedures are set up to prevent, and do systematically prevent, policyholders from even being able to satisfy the burdensome records requirement.  Defendants employ the five-year look-back to engage in a deliberately lengthy and burdensome claims handling process, such that claims are processed—if at all—well after Defendants have received "proper written proof of loss," in further violation of HCC's contract with policyholders.

30.     Many policyholders who attempt to provide Defendants with the documents requested, either directly or through their health care providers, are prevented from doing so by Defendants' intentionally dilatory claims processing procedures.

31.     Defendants' customer service representatives delay the processing of claims by, among other tactics: requesting even more legally irrelevant records; ignoring policyholders' attempts to contact them; inventing reasons for why the provided documents are inadequate; falsely informing policyholders that their health care providers have been unable or unwilling to provide the requested records; and falsely asserting that they do not have records that are in fact in their possession.  In this way, Defendants employ the five-year look-back as a vehicle to delay—and constructively deny—valid claims.

32.     HCC also trains its customer service representatives, called Brand Care Specialists, to obstruct policyholders instead of helping them.  Upon information and belief, the

majority of (if not all) customer service calls to HCC are transferred to Global Response Corporation, a third-party contractor whose employees—the Brand Care Specialists—are trained by HCC to handle HCC's customer service.

33. Brand Care Specialists are forced to use a script provided by HCC that walks them through improper denial and obstruction of claims. The script is designed to discourage policyholders from seeking payment on their claims or from successfully providing sufficient information to process existing claims.

34. A disillusioned Brand Care Specialist described the training process on a public consumer protection forum, including HCC's threats that Brand Care Specialists would be "thrown under the bus" for deviating from HCC's intentionally obstructionist script:[3]

> Even internally it was obvious that the name of the game is runaround. . . .  [T]here was never any clarity as to what we were supposed to do to help people navigate the bureaucracy.  It really felt like everything was designed to be so cumbersome that the customer would either get frustrated and give up or they could stall long enough to not have to pay out on the claim.  I even think the idea was to get us so frustrated that we'd blow the customers off or just tell them we had received documents just to get them to go away.  The whole idea here is that we're a legal buffer between HCC and you as was **made crystal clear in training when they said outright that we'd be thrown under the bus if we ever deviated from the script**; that HCC and Global Response would not protect us if legal action was directed at the company. Basically we'd be the bumper.

35. Instead of helping resolve disputes, Brand Care Specialists are instructed by HCC to tell policyholders that their claims relate to pre-existing conditions and/or to discourage policyholders by falsely representing that the STM contains a more expansive pre-existing condition exclusion than actually set forth in the policy.

36. HCC also deliberately prevents Brand Care Specialists from being able to seek answers to policyholders' questions.  Policyholders frustrated or confused by Brand Care Specialists' misleading, deceptive, and obstructionist tactics have no recourse because Brand

---

[3] *HCCMIS – A View from the Inside*, available at https://hccmis.pissedconsumer.com/a-view-from-the-inside-20160424835550.html (last visited 12/11/2017).

Care Specialists are not empowered to transfer policyholder calls to HCC.  As the same

individual stated on the consumer protection forum:[4]

> As a "Brand Care Specialist" we were trained to work in HCC's systems and handle their calls but there was almost no support from the company HCC or Global.  Not only did we take the most heart breaking calls from customers but also from hospitals and debit collectors looking to get information on claims to pursue the customer. . . .  [P]erhaps most tragically if we wanted to help someone out the only real options were to post to an internal Microsoft SharePoint website and hope that someone took it to HCC or to pass it to another team member acting as manager to have an email sent to the same place that yours would go.  The only way anything went somewhere was if the caller mentioned a lawsuit and at that point it was passed to the HCC legal team and we were instructed to end the call.  I want to emphasize here that we had no way to contact HCC directly, or to interact with them (I'm guessing by design) so we had no way to ever get your issues addressed beyond what you could find out for yourself. . . .

> The only [Brand Care Specialists] that can take it are the ones that can just parrot out the party line "Did you read your policy?", "Did you check the website?", "Did you send in the forms?" and basically convince themselves that it's always the customers fault.  That's right it's your fault for not taking a day or so and doing a through [sic] investigation on the company, you had/have no expectation of not being screwed.

> . . . Even trying to help out a customer by using non-legal terms or walking them through the disheartening process of claims was cause for a "Coaching", that is management talk for a dressing down but not on the record.  So even the ability to explain things to you in terms you'd understand was tightly controlled.

> It basically comes down to this; When you call in the people that are on the other line have no power, ZERO authority or means to help you out beyond what you can do for yourself on the websites.  In my bosses words "We're just telling them what is on the website and what they can find out for themselves".

37.    Brand Care Specialists are further instructed by HCC to deceive policyholders

who ask to appeal a denial of a claim, by telling them the matter has been escalated without

actually escalating the matter until 60 days after the appeal is requested.  HCC, through its Brand

Care Specialists, thus makes false statements to policyholders in order to induce them to stop

seeking payment.

---

[4] *See supra* n.3.

38.     Brand Care Specialists have reported myriad complaints to HCC.  HCC accordingly knew and knows, among other things, that there is widespread and intense customer dissatisfaction with its services and that attempts to secure payment from HCC are being denied and obstructed in bad faith.

### 2. Investigations by State Regulators

39.     These fraudulent practices have captured the attention of state regulators.

40.     For example, in a recent filing, HCC stated that "[c]urrently, there is a multi-state market conduct examination ongoing related to the Company's practices on short term medical insurance."[5]  State insurance departments do routine market conduct examinations of the insurers domiciled in their state every three to five years.  Multi-state market conduct examinations, on the other hand, are not routine: they are conducted only of companies about whose market conduct multiple insurance departments have serious questions, regardless of their state of domicile.  HII recently disclosed that the Indiana Department of Insurance is serving as the managing participant of the multi-state examination, and that "the examination includes, among other things, a review of whether [Defendants have] engaged in any unfair or deceptive acts or non-compliant insurance business practices."[6]  To date, at least forty-two states have joined the multi-state examination.

41.     Defendants' unlawful conduct also triggered an investigation by the Montana Commissioner of Securities and Insurance ("CSI").  In a May 9, 2016 Notice of Proposed Agency Action,[7] the CSI found that Defendants "routinely" sell STMs "through misinformation and deception" and concluded that Defendants "violated [Montana law] by making statements and omissions which misrepresented the terms" of their STMs, including "by misrepresenting pertinent facts or policy provisions."

---

[5] HCC Life Insurance Company, Statutory Financial Statements and Supplemental Schedules, December 31, 2016 and 2015.

[6] Heath Insurance Innovations, Form 10-Q for the period ending June 30, 2017.

[7] See Montana Commissioner of Securities and Insurance, *Notice Of Proposed Agency Action And Opportunity For Hearing* (May 9, 2016), available at http://csimt.gov/wp-content/uploads/Notice-of-PAA.pdf.

42.    HII has received cease and desist letters from, at least, the states of Michigan (on May 1, 2014) and Arkansas (on March 28, 2016).  These letters noted that HII was selling short-term insurance plans through unlicensed brokers and/or through misinformation and deception.  Upon information and belief, Defendants knowingly worked with unqualified and unlicensed brokers who used common unscrupulous and dishonest tactics to sell HCC's insurance policies.

43.    HII also recently disclosed that it is under investigation by the Massachusetts Attorney General's Office and the Texas Department of Insurance,[8] and on June 1, 2017, the Florida Office of Insurance Regulation "determined [HII] is not competent" and denied HII's application for licensure as a third-party administrator.[9]

C.    **Plaintiffs' Experiences with HCC's Insurance**

1.    **Plaintiff Aliquo**

44.    Plaintiff Mark Aliquo purchased a short-term medical insurance policy, jointly administered by HCC and HII, on or about March 17, 2016, to be effective on April 1, 2016.

45.    Mr. Aliquo purchased his policy through HII, following an unsolicited call from HII.  He communicated with his broker exclusively by telephone—the application process was entirely verbal, with all representations regarding the policy being made to Mr. Aliquo over the phone.  Mr. Aliquo never signed his application or policy, electronically or otherwise.  Instead, he was asked to provide a "verbal signature" to his over-the-phone application.

46.    Mr. Aliquo was not informed that Defendants routinely demand five years of medical records, or that Defendants would use this onerous records request as a vehicle to deny valid claims and/or rescind coverage.

47.    Mr. Aliquo paid premiums of over $500 per month for his policy, which also included his two sons as dependents.

48.    Subsequently, beginning in or about April 2016 and continuing through September 2016, Mr. Aliquo sought treatment for, *inter alia*, severe nausea, with the ailment

---

[8] *See supra* n.6.
[9] Florida Office of Insurance Regulation, letter dated June 1, 2017.

necessitating multiple visits to multiple physicians for diagnosis and treatment.  He was ultimately diagnosed with and treated for hemochromatosis, a genetic condition resulting in excess iron being stored in the internal organs.

49.     Following each visit with his health care providers, Mr. Aliquo's providers and/or Mr. Aliquo promptly and properly submitted claims to HCC.

50.     Mr. Aliquo properly filed claims for his treatment.  The treatment fell within the scope of Mr. Aliquo's policy.  Yet Defendants refused to pay any of the claims.

51.     Instead, subsequent to filing his claims, Mr. Aliquo received letters from HCC stating that more information from providers was needed.  However, the letters were purposefully vague as to either the missing information or the specific records sought.

52.     One such letter from HCC stated that information had been sought but was missing, and claims could not be processed accordingly.  But the letter did not identify the missing information, stating in its entirety:

> This letter is to notify you that additional information was previously requested of you or one of your medical providers; however this information is still outstanding.  Before any further consideration can be given to your claim, all information must be submitted.
>
> Please return this letter with the requested information to our office within 15 days of the date of this letter, and upon receipt, we will make a determination within 20 days.  Failure to respond in a complete and timely manner may result in the denial of your claim(s).

53.     Other letters from HCC made ambiguous and unduly burdensome requests for "Medical Records from all providers/hospitals from 04/01/2011 thru [sic] present."

54.     Mr. Aliquo worked in good faith to provide all records requested.  In the course of providing records and following up on the status of his claim, Mr. Aliquo called HCC and HII repeatedly from at least May 2016 to October 2016.

55.     At one point, a representative candidly acknowledged to Mr. Aliquo that the impermissible look-back was designed to constructively deny claims, stating that it was Defendants' uniform policy to deny all claims "at first," and then to make increasingly

12

burdensome record requests.

56.     In or about October 2016, Mr. Aliquo sought to have his claims escalated to management for a 4-6 week review.  Subsequently, he was informed by HCC that his records indicated "treatment for alcohol abuse," and that this constituted grounds for his policy to be rescinded, which HCC promptly did and refunded Mr. Aliquo's premiums.  However, this action was improper and the records relied upon did not constitute evidence of such treatment.

57.     The medical bills at issue totaled roughly $70,000.  Those bills have since gone into collection and Mr. Aliquo has worked out a payment plan, totaling thousands of dollars every month.

58.     Mr. Aliquo's experience is consistent with Defendants' standard practice, which is systematically designed, implemented, and enforced by Defendants to effectuate the delay and denial of policyholders' valid claims.  Had Mr. Aliquo known the truth about Defendants' practices, he would not have purchased HCC's substandard insurance.

**2.     Plaintiff Bryant**

59.     Plaintiff Kevin Bryant purchased an "HCC Advantage" short-term insurance policy, with an effective date of January 1, 2017 and for a six-month term.

60.     Mr. Bryant purchased this policy through Agile Health Insurance.  He located the policy through an internet search for short-term insurance.  The application process was conducted entirely online, and he received confirmation of his coverage via email.  Mr. Bryant paid premiums of over $200 per month for his policy, to Agile Health Insurance.

61.     Mr. Bryant was not informed that Defendants routinely demand five years of medical records, or that Defendants would use this onerous records request as a vehicle to deny valid claims and/or rescind coverage.

62.     In mid-January 2017, Mr. Bryant suffered a back injury while golfing.  He was ultimately diagnosed with a herniated disc, and underwent surgery to correct the herniation on January 30, 2017.

63.     Following each visit with his healthcare providers during the period of coverage,

13

Mr. Bryant's providers promptly and properly submitted claims to HCC for his treatment, which fell within the scope of Mr. Bryant's policy.  Yet HCC has, to date, refused to cover Mr. Bryant's claims.

64.    Instead, subsequent to filing his claims, Mr. Bryant received letters from HCC stating that more information from providers was needed.  However, the letters were purposefully vague as to either the missing information or the specific records sought.

65.    One such letter from HCC stated that information had been sought but was missing, and claims could not be processed accordingly.  But the letter did not identify the missing information, stating in its entirety:

> This letter is to notify you that additional information was previously requested of you or one of your medical providers; however this information is still outstanding.  Before any further consideration can be given to your claim, all information must be submitted.
>
> Please return this letter with the requested information to our office within 15 days of the date of this letter, and upon receipt, we will make a determination within 20 days.  Failure to respond in a complete and timely manner may result in the denial of your claim(s).

Mr. Bryant received at least 139 of these letters between March 1, 2017 and the present.

66.    Other letters from HCC made ambiguous and unduly burdensome requests for "Complete medical records from 1/1/2012 to current."

67.    Despite these vague requests, Mr. Bryant worked in good faith to provide HCC with all requested records.  Mr. Bryant confirmed with each of his providers that they had received HCC's requests for medical records and transmitted all requested records to HCC.  In the course of providing records and following up on the status of his claim, Mr. Bryant called HCC repeatedly between January 2017 and the present.

68.    However, despite Mr. Bryant's efforts to satisfy HCC's medical records request, HCC has unlawfully denied Mr. Bryant's claims.  Mr. Bryant received several Explanation of Benefit ("EOB") forms dated November 29, 2017 and stating: "This file has been closed due to lack of requested information from the provider(s).  We need a complete copy of medical records

14

to reopen this file." Moreover, due to Defendants' delay tactics, at least one of Mr. Bryant's medical providers has sent his pending medical bills to a collections agency, thereby constructively denying Mr. Bryant's claim.

69.  The medical bills at issue totaled more than $8,000.

70.  Mr. Bryant's experience is consistent with Defendants' standard practice, which is systematically designed, implemented, and enforced by Defendants to effectuate the delay and denial of policyholders' valid claims. Had Mr. Bryant known the truth about Defendants' practices, he would not have purchased HCC's substandard insurance.

### 3.  **Plaintiff Lacy**

71.  Plaintiff Tim Lacy purchased an HCC short-term insurance policy in April, 2016 with an effective date of May 17, 2016 and running for a six-month term.

72.  Mr. Lacy purchased the policy online. He paid premiums of nearly $600 per month.

73.  Mr. Lacy was not informed that Defendants routinely demand five years of medical records, or that Defendants would use this onerous records request as a vehicle to deny valid claims and/or rescind coverage.

74.  Mr. Lacy experienced a severe heart attack on May 23, 2016. Thereafter, Mr. Lacy received lifesaving treatment, including a stent, incurring medical bills totaling approximately $100,000.

75.  Prior to the heart attack, Mr. Lacy had received no diagnosis or treatment of any heart ailment.

76.  However, on one occasion in June of 2011 (4 years and 11 months prior to his heart attack), Mr. Lacy felt chest tightness of unknown origin. He sought a medical evaluation, and received an EKG and chest X-ray.

77.  At this evaluation, Mr. Lacy received no diagnosis. No determination was made as to whether Mr. Lacy had heart disease or whether the chest pain he had experienced was related to a cardiovascular issue. Instead, his healthcare provider determined that his chest pain

had been caused by anxiety.

78.     Accordingly, Mr. Lacy did not have reason to believe he had a preexisting heart condition when he purchased his insurance.

79.     After receiving treatment for the 2016 heart attack, Mr. Lacy promptly and properly submitted claims to HCC for treatment that fell within the scope of his policy.  Yet HCC has, to date, refused to cover his claims.

80.     Instead, subsequent to filing his claims, HCC instead repeatedly sent him letters stating that they were unable to pay because they required additional information from his healthcare providers.  Mr. Lacy and his family spent dozens of hours in the burdensome process of ensuring that medical records dating back five years were recovered from providers and provided to HCC.

81.     Saddled with immense medical debts, Mr. Lacy did not give in, and succeeded in getting all requested medical records produced to HCC.  Nonetheless, HCC denied all of his claims on the ground that his 2011 chest pain evaluation was related to heart disease, and that his heart attack was therefore an uncovered preexisting condition.

82.     On December 5, 2017, HCC send a letter to Mr. Lacy upholding its denial of his claims, and attaching a document from the Medical Review Institute of America, dated September 20, 2017, purporting to be an external review of his claims.  That document states "it is possible that the treatment in 2011 was directly related to the condition in 2016" and also states that Mr. Lacy's treatment in 2011 was "definitely related to heart disease…he was evaluated for possible CAD."

83.     However, Mr. Lacy's treating physician wrote a letter in April 2017 stating that his 2011 evaluation was related to anxiety, that any irregularities found in those tests were congenital, and that there is nothing to suggest preexisting coronary artery disease prior to Mr. Lacy's 2016 hospitalization.

84.     Mr. Lacy's claims have been denied in bad faith.

85.     Had he known the truth about Defendants' claims processing practices, he would

not have purchased HCC insurance.

### D.   **Complaints About HCC's Insurance**

86.   Plaintiffs' experiences are typical examples of the experiences of myriad other victims.  Publicly available sources are replete with reviews where consumers complain of the identical sales, service, and claims processing issues concerning HCC's short-term insurance policies that are at issue here.  A small sample appears below ([sic] throughout):

a.   **"S.L."**[10]

Horrible, bad, disgusting, irresponsible Insurance. I bought the short term Medical insurance for my husband on January 2015 while we were waiting for a long term insurance's confirmation. HCC approved my husband and me quickly because we had no major healthy issues in the past our record is clear. We paid our premium and officially under coverage. Unfortunately and unexpectedly, my husband had an heart attack and almost die. He was in the hospital for more than a month. For the next few months, I tried very hard to have HCC pay for our bills but they kept giving us hard time. With a husband who almost die and care for, I ran out of energy. I didn't even have energy to file a complain until now. The total amount HCC paid was $212.40.

b.   **"Rick"**[11]

It is with deep regret that I ever chose HCC health insurance. This was a mistake that has completely turned my life upside down. When I applied for this health coverage through my local insurance agent, I was led to believe that this coverage was good short term insurance and met the minimum Obama Affordable Care Act requirements. Recently I found out that this is not true. When I applied for this insurance I believed that I qualified for this coverage. Now after having a major heart attack in December and bills totaling about $66,000 I have been denied any coverage due to a doctor's note about 4 years ago stating that I have a degenerative disc in my lower back. I was told by my doctor that my discs were showing NORMAL wear from aging. He said that all adults have some form of this. My doctor did NOT call this a Disease. Degenerative disc is not a DISEASE - it is a NORMAL part of aging. When someone applies for coverage through this company it should be required to produce 5 years of medical

---

[10]   *See* Better Business Bureau, *Profile: HCC Medical Insurance Services, LLC*, available at https://www.bbb.org/indy/business-reviews/insurance-health/hcc-medical-insurance-services-llc-in-indianapolis-in-90005439/reviews-and-complaints (last visited 12/11/2017).

[11]   *See* Better Business Bureau, *Profile: HCC Medical Insurance Services, LLC*, available at https://www.bbb.org/indy/business-reviews/insurance-health/hcc-medical-insurance-services-llc-in-indianapolis-in-90005439/reviews-and-complaints (last visited 12/11/2017).

records at that time so it is clear that patients are eligible for coverage. It is clear that they are more concerned about collecting premiums than doing the right thing. It seems maybe I would have been better off if I had not survived my heart attack. DO NOT EVEN CONSIDER THIS INSURANCE!

     **c.**     **"Ann D."[12]**

I would NEVER, EVER suggest that anyone purchase insurance from HCC.  I have been fighting with them for nearly 10 months to pay medical claims.  Bills are now being sent to collections because of HCC excuses such as, "We need more records", "We didn't have your correct address".  That's the very short list; other comments were, "We don't have that provider on file" when they had sent a denial notice to the provider.  My favorite (NOT) was when speaking with a representative, I told her I had another question. Her response was, "I just closed your account on the computer, are you telling me you want me to open it again?".  Um, Yes, I am telling you I want you to open the account again.  Sheesh.  I've submitted a complaint to the State Insurance Commission and am considering legal action.  DO NOT use HCC.

     **d.**     **"Golam"[13]**

File a claim on 03/21/2016, did not hear them for long time although their email said they will respond within 60 business days. I again contacted on 9/2/2016 and they said they will get back in 30 days which they did not. Now today (1/10/2017) contacted and their initial response was I don't have any claim filed. After a long wait, they could find my previous notes and now claiming I need to send some some extra information which was not listed in their claim form. So basically either they are lying or trying to put me in some of their "fine printing" loophole. I would appreciate their requirement if they send me those after my first claim filing. But they did not respond and each time they are trying to tell me a new story. So basically its a fraudulent company and govt. should close it down ASAP.

     **e.**     **"Erica M."[14]**

Completely outraged with this company.  I was looking for a full medical plan and the person on the phone told me that's what I would be getting and signed me up for a short term plan instead.  I should have read over my policy sooner, however I believe this is an unethical company.  Now I will pay 2% of my income at the

---

[12]  *See* Yelp, *HCC Medical Insurance Services*, available at https://www.yelp.com/biz/hcc-medical-insurance-services-indianapolis (last visited 12/11/2017).

[13]  *See* Better Business Bureau, *Profile: HCC Medical Insurance Services, LLC*, available at https://www.bbb.org/indy/business-reviews/insurance-health/hcc-medical-insurance-services-llc-in-indianapolis-in-90005439/reviews-and-complaints (last visited 12/11/2017).

[14]  *See* Yelp, *HCC Medical Insurance Services*, available at https://www.yelp.com/biz/hcc-medical-insurance-services-indianapolis (last visited 12/11/2017).

end of the year, plus the $175/month I paid to this
company. Didn't even cover my OBGYN. That goes toward the
deductible. I feel defeated and have spent the morning crying :(

## V.    TOLLING

### A.    Discovery Rule Tolling

87.    Plaintiffs and Class Members had no way of knowing about Defendants' practices
with respect to the sale of insurance and administration of claims because Defendants hid the fact
that they employ the five-year look-back as a vehicle to deny valid claims, delay valid claims to
the point of constructive denial, or void policies through post-claims underwriting.

88.    Within the period of any applicable statutes of limitation, Plaintiffs and Class
Members could not have discovered through the exercise of reasonable diligence that Defendants
were hiding their true practices.

89.    All applicable statutes of limitation have been tolled by operation of the discovery
rule.

### B.    Fraudulent Concealment Tolling

90.    Instead of disclosing its true practices, Defendants knowingly and falsely
represented that HCC was a reputable insurance company that paid claims.

91.    All applicable statutes of limitation have therefore also been tolled by
Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein
throughout the period relevant to this action.

### C.    Estoppel

92.    Defendants were under a continuous duty to disclose to Plaintiffs and Class
Members the true character, quality, and nature of their insurance scam.

93.    Instead, Defendants knowingly, affirmatively, and actively concealed the true
facts from policyholders.

94.    Based on the foregoing, Defendants are also estopped from relying on any statutes
of limitations in defense of this action.

19

## VI.   CLASS ACTION ALLEGATIONS

95.     This action is brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs bring this action on behalf of themselves and others similarly situated.

96.     First, Plaintiffs seek to represent a Multi-State RICO Class against all Defendants consisting of Class Members from states where Defendants disclose a six-, twelve-, or twenty-fourth-month pre-existing condition exclusion.  Those states are:  California (6 months); Colorado (12 months); Connecticut (24 months); Georgia (12 months); Idaho (6 months); Illinois (24 months); Maine (12 months); New Hampshire (24 months); New Mexico (6 months); North Dakota (24 months); South Dakota (12 months); Utah (24 months); Virginia (12 months); and Wyoming (6 months) (collectively, the "Covered States").  The proposed Multi-State RICO Class may be defined as:

> The Multi-State RICO Class consists of all individuals in the Covered States who: (1) purchased one of HCC's short-term health insurance policies in a Covered State; (2) used HII as a broker at purchase and/or were billed by HII or Agile Health Insurance; and (3) had at least one claim denied, either formally or constructively, and/or had their policy rescinded, since a date to be ascertained through discovery.

97.     Plaintiffs also seek to represent a Multi-State Breach of Contract Class against HCC in the Covered States.  The proposed Multi-State Breach of Contract Class may be defined as:

> All individuals who: (1) purchased one of HCC's short-term health insurance policies in the Covered States; and (2) had at least one claim denied, either formally or constructively, and/or had their policy rescinded, since a date to be ascertained through discovery.

98.     In addition to the Multi-State RICO and Multi-State Breach of Contract Classes, Plaintiffs seek to represent state-based Classes consisting of Class Members from Idaho, Maine, and South Dakota, as well as any additional state-based Classes; subclasses; or common question "issue" Classes that Plaintiffs may propose and/or the Court may designate under Rule 23(b)(1), (b)(2), (b)(3), and/or (c)(4) at the time of class certification.  The State Classes may be defined as follows:

> Idaho Class:
>
> The Idaho Class consists of all individuals who: (1) purchased one of HCC's short-term health insurance policies in Idaho; and (2) had at least one claim denied, either formally or constructively, and/or had their policy rescinded, since a date to be ascertained through discovery.
>
> Maine Class:
>
> The Maine Class consists of all individuals who: (1) purchased one of HCC's short-term health insurance policies in Maine; and (2) had at least one claim denied, either formally or constructively, and/or had their policy rescinded, since a date to be ascertained through discovery.
>
> South Dakota Class:
>
> The South Dakota Class consists of all individuals who: (1) purchased one of HCC's short-term health insurance policies in South Dakota; and (2) had at least one claim denied, either formally or constructively, and/or had their policy rescinded, since a date to be ascertained through discovery.

99.     The Multi-State RICO Class, Multi-State Breach of Contract Class, and State Classes are collectively referred to as the "Class" in this Complaint.

100.    Excluded from the Class are Defendants, any entity in which Defendants have or had a controlling interest or which have or had a controlling interest in any Defendant, and Defendants' legal representatives, assigns, and successors.  Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

101.    Plaintiffs reserve the right to amend or modify the Class definitions in connection with a motion for class certification or as warranted by discovery.

102.    The Class seeks the injunctive relief of a practice change under Rule 23(b)(2) that

requires insurance claims processing to adhere to the law (including, at a minimum, the cessation of the five-year look-back, post-claims underwriting, and fraudulent claims-handling practices).

103.     Class Members also seek a class under Rule 23(b)(3) for monetary recoveries sustained as a result of Defendants' misconduct.

104.     The Class meets the requirements of Rule 23(a), Rule 23(b)(2), and/or Rule 23(b)(3).

105.     Numerosity:  Plaintiffs do not know the exact size or identities of the proposed Class, however, Plaintiffs believe that the Class encompasses thousands of individuals who are dispersed geographically throughout the Covered States.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.  The Class is ascertainable by Defendants' records, and Class Members may be notified of the pendency of this action by mail and/or electronic mail, supplemented if deemed necessary or appropriate by the Court by published notice.

106.     Existence and Predominance of Common Questions of Fact and Law:  There are questions of law and fact that are common to the Class, which predominate over any questions affecting only individual members of the Class.  The damages sustained by Plaintiffs and Class Members flow from the common nucleus of operative facts surrounding Defendants' misconduct.  The common questions include, but are not limited to the following:

 a.     whether Defendants employed a "five-year look-back" at legally irrelevant medical records;

 b.     whether Defendants engaged in post-claims underwriting;

 c.     whether Defendants employed unlawful claims-handing processes, whereby they deliberately delayed the processing of valid claims;

 d.     whether Defendants' policies and procedures codified or effected systematic omissions and/or misrepresentations, breaches of contract, or other illegalities;

 e.     whether a reasonable consumer would consider Defendants' omissions

and/or misrepresentations material in purchasing Defendants' health

insurance policies;

f.      whether, as a result of Defendants' omissions and/or misrepresentations of

material facts, Plaintiffs and Class Members have suffered a loss of

monies and/or property and/or value;

g.      whether Defendants' conduct violated the laws of the States in which they

operated;

h.      whether Defendants committed criminal acts;

i.      whether Defendants acted as part of an enterprise; and

j.      whether Plaintiffs and Class Members are entitled to monetary damages

and/or other remedies and, if so, the nature of any such relief.

107.    Typicality:  Plaintiffs' claims are typical of the Class' claims, because Plaintiffs and the Class sustained damages arising out of Defendants' wrongful conduct, and because Plaintiffs and the other members of the Class have an interest in preventing Defendants from engaging in such activity in the future.

108.    Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in class and consumer litigation and have no conflict of interest with Class Members in the maintenance of this class action. Plaintiffs will vigorously pursue the claims of the Class.

109.    Superiority:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation makes it impracticable for Class Members to individually seek redress for the wrongs done to them.  Plaintiffs believe that Class Members, to the extent they are aware of their rights against Defendants herein, would be unable to secure counsel to litigate their claims on an individual basis because of the relatively small nature of the individual damages, and that a class action is the only feasible means of recovery for Class

Members. Individual actions also would present a substantial risk of inconsistent decisions, even though each Class Member has an identical or substantially similar claim of right against Defendants. Plaintiffs envision no difficulty in the management of this action as a class action.

110. A Rule 23 (b)(2) class for injunctive relief is warranted because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## CLAIMS FOR RELIEF

### First Claim for Relief
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**
**Violation of 18 U.S.C. § 1962(c)-(d)**
**(By Plaintiffs, on Behalf of the Multi-State RICO Class, Against Defendants)**

111. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

112. Plaintiffs bring this Claim for Relief on behalf of the Multi-State RICO Class against Defendants HCC and HII (for the purposes of this Claim for Relief, the "RICO Defendants").

113. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

114. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. 18 U.S.C. § 1962(d).

115. As explained below, the RICO Defendants have violated Sections 1962(c) and (d).

### A. The RICO Defendants Engaged in a Scheme to Defraud

116. The purpose of the RICO Enterprise, defined below, was to deceive policyholders about the true nature of the RICO Defendants' STM products and extract premiums from Plaintiffs and the Multi-State RICO Class for what were effectively worthless insurance policies.

The motivation was simple:  to increase the RICO Defendants' revenues and profits.

117.    In devising and executing the illegal scheme, the RICO Defendants knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Multi-State RICO Class or to obtain money from Plaintiffs and the Multi-State RICO Class by means of materially false or fraudulent pretenses, representations, promises, omissions of material facts, and unfair and unconscionable business practices.

118.    Specifically, the RICO Defendants' marketing and claims processing procedures are purposely engineered and uniformly applied to accomplish the delay and denial of valid claims and/or rescission of valid policies.

119.    The RICO Defendants begin by engaging in serial and uniform misrepresentations and omissions to Plaintiffs and Multi-State RICO Class Members, as described above.  Indeed, as described above, in a 2016 Notice of Proposed Agency Action, the Montana CSI found that the RICO Defendants and other members of the RICO Enterprise "routinely" sell STMs "through misinformation and deception."  The CSI concluded that the RICO Defendants "violated [Montana law] by making statements and omissions which misrepresented the terms" of their STMs, including "by misrepresenting pertinent facts or policy provisions."  It is through such serial and uniform misrepresentations that the RICO Defendants first induce Multi-State RICO Class Members to purchase their STM products.

120.    Then, upon submitting claims, Multi-State RICO Class Members are required to provide *every single medical record* from the last five years of their medical history, regardless of whether such records relate to the claim at issue and notwithstanding that this requirement is not disclosed in advance.  As described above, the RICO Defendants use this requirement to either: (i) locate a pre-existing condition well beyond the contracted-to period and deny the claim; (ii) locate a disqualifying medical condition and retroactively void the policy, a practice known as "post-claims underwriting"; or (iii) delay policyholder claims to the point of constructive denial.  Indeed, the Montana CSI found that through these unlawful practices, "valid claims . . . are routinely denied under these policies" and that the RICO Defendants and other

members of the RICO Enterprise thereby "violated [Montana law] in their claim handling practices."

121.    This scheme to defraud extends far beyond Montana—it extends across the United States,[15] including in each Covered State.

**B.    The RICO Defendants Have Used Mail and Wire Facilities in Furtherance of their Scheme to Defraud**

122.    To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the RICO Enterprise, defined below, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

123.    Specifically, as alleged herein, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. The multiple acts of racketeering activity the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the RICO Enterprise.  The RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce.

124.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.  For the purpose of

---

[15] *See* HII Press Release, *Health Insurance Innovations Partners With HCC Like Insurance Company to Expand Short-Term Medical Portfolio*, (Jun. 3, 2013), available at http://investor.hiiquote.com/releasedetail.cfm?ReleaseID=775244 ("HII's new short-term medical plan with HCC is being launched in 45 states and will enhance our national presence by providing a competitive product that meets the needs of today's consumers.").

executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

125.   The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

    a.   <u>Mail Fraud</u>:  The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to defraud and obtain money by means of false pretenses, misrepresentations, promises, and omissions.

    b.   <u>Wire Fraud</u>:  The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money by means of false pretenses, misrepresentations, promises, and omissions.

126.   The RICO Defendants' uses of the mails and wires include, but are not limited to, the transmission or delivery of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of the RICO Defendants' illegal scheme:

    a.   sales and marketing materials, including advertising, websites, and brochures, concealing the true nature of the RICO Defendants' effectively worthless STM products and fraudulent claims-handling practices;

    b.   application and registration materials for the RICO Defendants' STM products;

    c.   documents to process and receive payment for the RICO Defendants' STM products;

    d.   claims processing materials, including letters requesting medical records and other documentation and Explanation of Benefits ("EOB") forms; and

     e.     other documents and things, including electronic communications.

127.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail the items described above and alleged below:

| From | To | Date | Description |
|---|---|---|---|
| HCC | Plaintiff Aliquo | June 2016 – January 2018 | Over 100 EOB letters stating a denial of coverage on improper grounds. |
| HCC | Plaintiff Aliquo | May 2016 – November 2016 | At least 230 letters from HCC's claims department seeking additional, unspecified medical records for the handling of claims and informing Plaintiff Aliquo that said claims could not be processed, absent said records. |
| HCC | Plaintiff Bryant and/or his providers | January 2017 – November 2017 | At least 170 letters from HCC's claims department seeking additional, unspecified medical records for the handling of claims and/or informing Plaintiff Bryant that said claims could not be processed, absent said records. |
| HCC | Plaintiff Lacy | May 2016 – December 2017 | At least 50 letters from HCC's claims department seeking additional, unspecified medical records for the handling of claims and informing Plaintiff Lacy that said claims could not be processed, absent said records, or explanation of benefit ("EOB") letters stating a denial of coverage on improper grounds |

128.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals, and sounds, including those items described

above and alleged below:

| From | To | Date | Description |
|---|---|---|---|
| HII | Plaintiff Aliquo | March 2016 | HII called Plaintiff Aliquo, unsolicited, in an attempt to fraudulently induce him into purchasing Defendants' STM. |
| HCC | Plaintiff Aliquo | April 2016 – October 2016 | Telephone calls from HCC Brand Care Specialists to Plaintiff Aliquo facilitating the frustration, and ultimately improper denial, of Plaintiff Aliquo's meritorious claims. |
| HII | Plaintiff Aliquo | April 2016 – October 2016 | Telephone calls from HII representatives to Plaintiff Aliquo facilitating the frustration, and ultimately improper denial, of Plaintiff Aliquo's meritorious claims. |
| Plaintiff Aliquo | HCC | April 2016 – October 2016 | Telephone calls from Plaintiff Aliquo to HCC Brand Care Specialists resulting in the frustration, and ultimately improper denial, of Plaintiff's meritorious claims. |
| Plaintiff Aliquo | HII | April 2016 – October 2016 | Telephone calls from Plaintiff Aliquo to HII Brand Care Specialists resulting in the frustration, and ultimately improper denial, of Plaintiff's meritorious claims. |
| HCC | Plaintiff Bryant | January 2017 – Present | Telephone calls from HCC Brand Care Specialists to Plaintiff Bryant facilitating the frustration, and ultimately improper denial, of Plaintiff Bryant's meritorious claims. |
| Plaintiff Bryant | HCC | January 2017 – Present | Telephone calls from Plaintiff Bryant to HCC Brand Care Specialists resulting in the frustration, and ultimately constructive denial, of Plaintiff |

| From | To | Date | Description |
|------|-----|------|-------------|
|  |  |  | Bryant's meritorious claims. |
| HCC | Plaintiff Lacy | May 2016 – December 2017 | Telephone calls from Plaintiff Lacy to HCC Brand Care Specialists resulting in the frustration, and ultimately improper denial or constructive denial, of Plaintiff Lacy's meritorious claims. |

129.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities.  Specifically, the RICO Defendants made misrepresentations about their STM products on their websites and through ads online, all of which were intended to mislead regulators and the public about the quality of their STM products.

130.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive and lure policyholders into purchasing their STM products, which the RICO Defendants knew were effectively worthless.

131.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.  However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.  These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

**C.    The RICO Defendants Operated an Association-in-Fact Enterprise**

132.    The RICO Defendants are separate legal entities.  At all relevant times, each of the RICO Defendants has been a "person" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

133.    At all relevant times, the RICO Defendants, along with other individuals and entities, including unknown third parties involved in the marketing, sale, and administration of

the RICO Defendants' STMs, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining premiums from policyholders, and through which they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4), as described herein. The enterprise is called here the "RICO Enterprise."

134.     The association-in-fact RICO Enterprise consisted of at least the following entities and individuals, and likely others:

     a.    RICO Defendant HCC;

     b.    RICO Defendant HII;

     c.    Health Plan Intermediaries, LLC, a Florida limited liability company formed in 2003 and d/b/a/ "Health Insurance Innovations";

     d.    Health Plan Intermediaries Holdings, LLC, a Delaware limited liability company formed in 2012 and d/b/a as "HII";

     e.    Healthpocket, Inc., a Delaware corporation formed in 2012 and a wholly owned subsidiary of HII;

     f.    Global Response Corporation, a Florida company founded in 1974 to provide call center outsourcing services, which, as discussed above, works with HCC to train its "Brand Care Specialists" to obstruct policyholders and delay the payment of validly filed claims; and

     g.    Consumer Benefits of America ("CBA"), a Colorado company founded in 1982 to offer "group buying" discounts to members; the RICO Defendants issue their STMs to CBA, rather than directly to the policyholders, in states that apply less stringent consumer protection regulations to "group products" than individual products.

135.     At all relevant times, the RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in RICO Defendants' unlawful profit-making scheme.

136.    The RICO Defendants worked together to accomplish their scheme or common course of conduct.  Indeed, the RICO Defendants conduct their business—legitimate and illegitimate—through what they publicly describe as a "partnership."[16]

137.    Each RICO Defendant was employed by or associated with, and conducted or participated in the affairs of the RICO Enterprise:

      a.    HCC participated in, operated and/or directed the RICO Enterprise, by, among other things: (i) underwriting the RICO Defendants' STM products; and (ii) processing—and unlawfully delaying and denying— claims validly submitted pursuant to those STM products.

      b.    HII participated in, operated and/or directed the RICO Enterprise, by, among other things: (i) acting as the broker through which Plaintiff Aliquo and some Multi-State RICO Class Members purchased the RICO Defendants' STM products; and (ii) administering those STM Products by, among other things, billing Plaintiff Bryant and some Multi-State RICO Class Members through Agile Health Insurance, a division of HII's wholly owned subsidiary HealthPocket, Inc., and operating the patient portal through which policyholders can access information regarding Defendants' STMs.

138.    The CSI has also described the "scheme" through which the RICO Defendants partner to operate the RICO Enterprise.  RICO Defendant HII "solicit[s] insurers to underwrite short term medical and excepted benefit policies, and then organize[s] an extensive operation of insurance producers to sell those policies."  The CSI goes on to explain that HII and its subsidiaries "act[] as, and hold[] themselves out as, administrators for each . . . insurer," including HCC.  Though the policies are underwritten by HCC, the CSI explains that "the HHI entities," including Healthpocket, Inc., "and the individuals behind these entities are the

---

[16] *Id.*

masterminds behind the short term medical policies at issue."

139.    At all relevant times, the RICO Enterprise:  (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including HCC and HII, their subsidiaries, and other entities and individuals associated for the common purpose of selling their effectively worthless STMs to Plaintiffs and Multi-State RICO Class Members.

140.    The RICO Defendants participated in the operation and management of the RICO Enterprise by directing its affairs, as described herein.  While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements

141.    Each participant in the RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the RICO Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues.

142.    Within the RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis.  The RICO Enterprise used this common communication network for the purpose of marketing, selling, and administering their STMs to the general public nationwide, including in each Covered State.

143.    The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the RICO Defendants' and others' hands.

144.    Without the RICO Defendants' willing participation, the RICO Enterprise's scheme and common course of conduct would have been unsuccessful.  Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to

implement and use the similar fraudulent tactics.

145.    The RICO Defendants have not undertaken the practices described herein in
isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. § 1962(d),
the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein.  Various
other persons, firms and corporations, including third-party entities and individuals not named as
defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in
these offenses and have performed acts in furtherance of the conspiracy to increase or maintain
revenues for the RICO Defendants and their unnamed co-conspirators throughout the illegal
scheme and common course of conduct described herein.

146.    The RICO Defendants aided and abetted others in the violations of the above
laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343
offenses.

147.    With knowledge and intent, the RICO Defendants and each member of the
conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy,
and have participated in the common course of conduct, to commit acts of fraud in marketing,
selling, and administering their effectively worthless STM products.

**D.    The RICO Enterprise Sought to Increase Defendants' Profits and Revenues**

148.    The RICO Defendants' engaged in their scheme to defraud to increase their
revenues and profits.

149.    For example, HII explained in its 2016 10-K that "[r]evenues for the year ended
December 31, 2016 were $184.5 million, an increase of $79.8 million, or 76.2%, compared to
2015."  HII attributed this growth "primarily" to "continued consumer demand for our affordable
healthcare products outside of the ACA open enrollment period and the diversification and
enhancement of our distribution system, including . . . AgileHealthInsurance.com."

150.    Similarly, during a March 2, 2015 Investors Conference, Bill Burke (President &
COO of HCC Insurance Holdings, Inc.) explained that HCC's "4% growth in gross written
premium, which was good" was "driven by our accident and health, which had a 13% increase

over the prior year . . . [including] our short-term medical business."

151.    Each member of the RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased revenue generated by the scheme to defraud Plaintiffs and the Multi-State RICO Class Members.

152.    For example, the Montana CSI also described the process by which this profit sharing takes place: "Typically, the insurance premium is paid to the HII entities, which then operate as the plan administrator and divide the premium among the various entities involved."

153.    Plaintiffs' experiences accord with the Montana CSI's observations regarding profit sharing—Plaintiff Bryant was billed by HII via Agile Health Insurance.

### E.    Plaintiffs and Class Members Suffered Property Losses

154.    As a direct and proximate result of their fraudulent scheme and common course of conduct in conducting the RICO Enterprise as described in this Complaint, the RICO Defendants were able to extract premiums from Plaintiffs and the Multi-State RICO Class for effectively worthless insurance policies.

155.    The RICO Defendants knew and intended that policyholders would rely on the material omissions regarding their effectively worthless STM products, would purchase these products, and would incur costs as a result.  Plaintiffs' reliance on this ongoing concealment is demonstrated by the fact that they purchased the RICO Defendants' STM products, which they would not have purchased had they known the true nature of the products.

156.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and the Multi-State RICO Class based on their misrepresentations and omissions, while providing STM products that they knew—and intended—would not provide the coverage promised to Plaintiffs and the Multi-State RICO Class.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

157.    As alleged above, the predicate acts had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and the Multi-State RICO Class.  The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Multi-State RICO Class Members' funds and avoiding the expenses associated with actually processing and paying Plaintiffs' and Multi-State RICO Class Members' valid claims for medical coverage.

158.    By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and the Multi-State RICO Class have been injured in their property in multiple ways, including but not limited to:

      a.    out-of-pocket payments for medical coverage that should have been, but was not, covered by the RICO Defendants' STM products; and

      b.    other, ongoing out-of-pocket expenses.

159.    The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused economic damage to Plaintiffs' and Multi-State RICO Class Members' property, and Plaintiffs and the Multi-State RICO Class are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

<u>**Second Claim for Relief**</u>

**BREACH OF CONTRACT**

**(By Plaintiffs, on Behalf of the Multi-State Breach of Contract Class, Against HCC)**

160.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

161.    Plaintiffs bring this Count against HCC on behalf of the Multi-State Breach of Contract Class under the laws of the Covered States.

162.    The policies that HCC sold Plaintiffs, combined with the timely payment of premiums, amounted to legally enforceable promises and obligations owed via contract.

36

163.    By accepting the premium payments from Plaintiffs, HCC agreed to timely process, reasonably investigate, and pay claim amounts for certain medical expenses according to the terms of the policies.

164.    In practice, however, HCC fails to abide by their contracts with policyholders. Specifically, HCC employs a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period, and deny policyholder claims based on medical conditions suffered well before the disclosed period, in violation of these contracts.

165.    Moreover, when HCC failed to perform timely process claims and make payments required by the policies, they breached contractual duties owed to Plaintiffs. Specifically, the delays associated with HCC's obstructionist tactics violate its contractual duty to pay benefits as soon as HCC receives a proof of loss form.

166.    HCC's breaches caused damage to Plaintiffs including but not limited to: interest and penalties charged by medical facilities on amounts due and outstanding; costs incurred to force HCC to perform their contractual obligations, make necessary payments, and enforce Plaintiffs' policies; lost time from work as a result of repeated calls to HCC or otherwise attempting to track down information related to Plaintiffs' claims; medical treatments foregone or not pursued because of the fear of denial, incurring more debt, and additional harassment from collection or billing personnel at medical facilities; and interest on the claim amounts that were improperly denied.

167.    Plaintiffs and Multi-State Breach of Contract Class Members owe monies to certain medical providers for reasons directly and proximately related to HCC's denials, and HCC continues to be in breach of their insurance contracts.

168.    The breaches by HCC have been material, going to the heart of the contract.

169.    All damages sustained by Plaintiffs and Multi-State Breach of Contract Class Members are the result of HCC's breach of obligations owed the Plaintiff and Class Members under the policies they purchased.  Plaintiff and Multi-State Breach of Contract Class Members are entitled to damages, including damages sustained and a refund of premiums.

170.    Under the particular facts alleged in this case, and in light of the clear and uniform breach, among other things, it is appropriate  under choice-of-law principles for Plaintiffs to allege a Mutli-State Breach of Contract Claim.  The essential elements of the law of contract are the same in each Covered State.  The laws of contract as applied to the facts here do not materially differ  and/or differ in ways that matter in this case.  Should the Court determine there exist any relevant differences, grouping is appropriate across the states at issue.

### Third Claim for Relief

**MAINE UNFAIR TRADE PRACTICES ACT**
**Violation of 5 M.R.S. §§ 205-A, *et seq.***
**(By Plaintiff Aliquo, on Behalf of the Maine Class, Against Defendants)**

171.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

172.    Plaintiff Aliquo (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against Defendants on behalf of the Maine Class.

173.    At all relevant times, Plaintiff has been entitled to the rights, protections, and benefits of the Maine Unfair Trade Practices Act and other Maine law.

174.    Defendants' conduct in selling their short-term health insurance policies was an unfair or deceptive act or practice in trade, in violation of Maine's Unfair Trade Practices Act, 5 M.R.S. §§ 205-A, *et seq.,* including 5 M.R.S. §§ 207.

175.    Defendants' violations caused loss of Plaintiff and Maine Class Members' money and property.

176.    Plaintiff and Maine Class Members suffered additional injuries in the form of out-of-pocket medical costs incurred due to Defendants' acts.

177.    The conduct described throughout this complaint took place in the State of Maine and harmed Maine consumers.

178.    Defendants failed to communicate, in bad faith, material facts within their knowledge that Plaintiff had no means of ascertaining.  These facts include, but are not limited to: that Defendants employ a "five-year look-back" to effectively extend their pre-existing

38

conditions exclusion well beyond the contracted-to period; that Defendants engage in post-claims underwriting; that Defendants employ unlawful claims handling procedures, including deliberately preventing policyholders from satisfying burdensome document requirements and training customer service representatives to discourage policyholders from seeking payment or pursuing an appeal; and that Defendants employ the services of unlicensed brokers who use misleading sales tactics.

179.    Defendants' practices are likely to deceive the public.  A reasonable consumer would be deceived by Defendants' statements and omissions in the selling of HCC's short-term health insurance policies—including their failure to disclose the "five-year look-back" policy—and Plaintiff and members of the Maine Class have in fact been deceived.  Injuries in violation of 5 M.R.S. §§ 205-A, *et seq.* will continue to accrue if Defendants do not abate their conduct.

180.    Defendants' practices are unfair, unscrupulous, and injurious to consumers.  They are contrary to the public policy of the State of Maine, as embodied in 24-A M.R.S.A. § 2152 and § 2154 (without exclusion), as well as of the United States, as codified in the ACA.

181.    Defendants' practices further contravene the specific standards delineated in 24-A M.R.S.A. § § 2164-D(3)(A), (B), (C), (E), and (F), and § 2164-D(4), according to which Defendants engage in unfair practices and compel insureds to initiate lawsuits.

182.    Defendants' practices are unfair, and injurious to competition, because they allow Defendants to undercut competitors' prices, and create an incentive for competitors to pursue similarly unscrupulous and deceptive tactics.

183.    Defendants' practices are likely to cause, and do cause, substantial injuries to consumers, which are not outweighed by a countervailing benefit to consumers or competition.  Such injuries cannot reasonably be avoided by consumers.

184.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices as set forth above, Defendants have been unjustly enriched by Plaintiff's payment of consideration in the purchase of Defendants' insurance policies.

185.    Accordingly, Plaintiff and the Maine Class are entitled to an order enjoining the

practices complained of herein, and any other relief that the Court may find just and proper.

186.     To the extent 5 M.R.S. § 213 requires a demand for relief over and above Plaintiff's repeated requests that Defendants pay his validly filed claims, Plaintiff satisfied this requirement through a demand for relief transmitted concurrently with this Complaint.  Plaintiff and the Maine Class are therefore also entitled to an award of monetary relief.

### Fourth Claim for Relief

**UNFAIR CLAIMS SETTLEMENT PRACTICES**
**Violation of 24-A M.R.S.A § 2436-A**
**(By Plaintiff Aliquo, on Behalf of the Maine Class, Against Defendants)**

187.     Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

188.     Plaintiff Aliquo (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against Defendants on behalf of the Maine Class.

189.     Defendants' conduct violated the Maine Insurance Code, 24-A M.R.S.A § 2436-A by, among other things:

  a.     knowingly misrepresenting pertinent facts including facts about HCC's claims processing and/or coverage;

  b.     failing to review claims within a reasonable time;

  c.     failing to affirm or deny coverage within a reasonable time of completing its investigation; and/or

  d.     without reasonable basis to contest liability or amount of damages, failing to effectuate prompt, fair, and equitable settlement of claims.

190.     Plaintiff and the Maine Class are entitled to recover damages with interest, costs and disbursements, and attorneys' fees for these violations pursuant to 24-A M.R.S.A § 2436-A(1).

**Fifth Claim for Relief**

**BREACH OF CONTRACT[17]**

**(By Plaintiff Aliquo, on Behalf of the Maine Class, Against HCC)**

191.     Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

192.     Plaintiff Aliquo (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against HCC on behalf of the Maine Class.

193.     The policies that HCC sold Plaintiff, combined with the timely payment of premiums, amounted to legally enforceable promises and obligations owed via contract.

194.     By accepting the premium payments from Plaintiff, HCC agreed to timely process, reasonably investigate, and pay claim amounts for certain medical expenses according to the terms of the policies.

195.     In practice, however, HCC fails to abide by their contracts with policyholders. Specifically, HCC employs a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period, and deny policyholder claims based on medical conditions suffered well before the disclosed period, in violation of these contracts.

196.     Moreover, when HCC failed to timely process claims and make payments required by the policies, they breached contractual duties owed to Plaintiff.  Specifically, the delays associated with HCC's obstructionist tactics violate its contractual duty to pay benefits as soon as HCC receives a proof of loss form.

197.     HCC's breaches caused damage to Plaintiff including but not limited to: interest and penalties charged by medical facilities on amounts due and outstanding; costs incurred to force HCC to perform their contractual obligations, make necessary payments, and enforce Plaintiff's policies; lost time from work as a result of repeated calls to HCC or otherwise attempting to track down information related to Plaintiff's claims; medical treatments foregone

---

[17] The breach of contract claim on behalf of each State Class is brought in the alternative to certification of the Multi-State Breach of Contract Class.

or not pursued because of the fear of denial, incurring more debt, and additional harassment from collection or billing personnel at medical facilities; and interest on the claim amounts that were improperly denied.

198.    Plaintiff and Maine Class Members owe monies to certain medical providers for reasons directly and proximately related to HCC's denials, and HCC continues to be in breach of their insurance contracts.

199.    The breaches by HCC have been material, going to the heart of the contract.

200.    All damages sustained by Plaintiff and Maine Class Members are the result of HCC's breach of obligations owed the Plaintiff and Class Members under the policies they purchased.  Plaintiff and Maine Class Members are entitled to damages, including damages sustained and a refund of premiums.

## Sixth Claim for Relief

## BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

### (By Plaintiff Aliquo, on Behalf of the Maine Class, Against HCC)

201.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

202.    Plaintiff Aliquo (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against HCC on behalf of the Maine Class.

203.    Through the unlawful "five-year look-back" and unlawful post-claims underwriting—and the attendant, unduly burdensome records requests that arise from those policies, acts, and practices—HCC unreasonably denied Plaintiff coverage for care that was covered under his insurance policy.

204.    Without exclusion, HCC also trained their customer service representatives to consciously mislead, obstruct, and delay payment of claims.  This claims-handling conduct was a matter of company policy and was without proper cause.

205.    HCC's claims handling practices demonstrate a refusal to cooperate and a denial to Plaintiff of the full benefit of performance.

206.    HCC engaged in a pattern and practice of unreasonably failing to give at least as much consideration to its insureds' interests as it gave its own interests, in the investigation and handling of claims.

207.    HCC has committed institutional bad faith.  HCC's institutional bad faith amounts to reprehensible conduct because the conduct is part of a repeated pattern of unfair practices and not an isolated occurrence.  The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in the established company policies of HCC.

208.    Plaintiff believes and alleges that HCC has breached their duty of good faith and fair dealing by other acts and omissions, of which Plaintiff is presently unaware and which will be shown in the course of discovery.

209.    As a direct and proximate result of the conduct of HCC, Plaintiff and Maine Class Members have suffered, and will continue to suffer, financial and other consequential damages, for a total amount to be shown at the time of trial.

210.    As a further proximate result of the aforementioned conduct of HCC, Plaintiff has been compelled to retain legal counsel to obtain the benefits due under the policy.  Therefore, HCC is liable to Plaintiff for those attorneys' reasonably necessary fees in an amount to be determined at the time of trial.

## Seventh Claim for Relief

### BREACH OF CONTRACT

### (By Plaintiff Lacy, on Behalf of the Idaho Class, Against HCC)

211.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

212.    Plaintiff Lacy (for the purposes of this Count, "Plaintiff") brings this Count against HCC on behalf of the Idaho Class.

213.    The policies that HCC sold Plaintiff, combined with the timely payment of premiums, amounted to legally enforceable promises and obligations owed via contract.

214.    By accepting the premium payments from Plaintiff, HCC agreed to timely

process, reasonably investigate, and pay claim amounts for certain medical expenses according to the terms of the policies.

215.    In practice, however, HCC fails to abide by their contracts with policyholders. Specifically, HCC employs a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period, and deny policyholder claims based on medical conditions suffered well before the disclosed period, in violation of these contracts.

216.    Moreover, when HCC failed to perform timely process claims and make payments required by the policies, they breached contractual duties owed to Plaintiff. Specifically, the delays associated with HCC's obstructionist tactics violate its contractual duty to pay benefits as soon as HCC receives a proof of loss form.

217.    HCC's breaches caused damage to Plaintiff including but not limited to: interest and penalties charged by medical facilities on amounts due and outstanding; costs incurred to force HCC to perform their contractual obligations, make necessary payments, and enforce Plaintiff's policies; lost time from work as a result of repeated calls to HCC or otherwise attempting to track down information related to Plaintiff's claims; medical treatments foregone or not pursued because of the fear of denial, incurring more debt, and additional harassment from collection or billing personnel at medical facilities; and interest on the claim amounts that were improperly denied.

218.    Plaintiff and Idaho Class Members owe monies to certain medical providers for reasons directly and proximately related to HCC's denials, and HCC continues to be in breach of their insurance contracts.

219.    The breaches by HCC have been material, going to the heart of the contract.

220.    All damages sustained by Plaintiff and Idaho Class Members are the result of HCC's breach of obligations owed the Plaintiff and Class Members under the policies they purchased.  Plaintiff and Idaho Class Members are entitled to damages, including damages sustained and a refund of premiums.

**Eighth Claim for Relief**

**BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**

**(By Plaintiff Lacy, on Behalf of the Idaho Class, Against HCC)**

221.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

222.    Plaintiff Lacy (for the purposes of this Count, "Plaintiff") brings this Count against HCC on behalf of the Idaho Class.

223.    Through the unlawful "five-year look-back" and unlawful post-claims underwriting—and the attendant, unduly burdensome records requests that arise from those policies, acts, and practices—HCC unreasonably denied Plaintiff coverage for care that was covered under his insurance policy.

224.    Without exclusion, HCC also trained their customer service representatives to consciously mislead, obstruct, and delay payment of claims.  This claims-handling conduct was a matter of company policy and was without proper cause.

225.    HCC's claims handling practices demonstrate a refusal to cooperate and a denial to Plaintiff of the full benefit of performance.

226.    HCC engaged in a pattern and practice of unreasonably failing to give at least as much consideration to its insureds' interests as it gave its own interests, in the investigation and handling of claims.

227.    HCC has committed institutional bad faith.  HCC's institutional bad faith amounts to reprehensible conduct because the conduct is part of a repeated pattern of unfair practices and not an isolated occurrence.  The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in the established company policies of HCC.

228.    Plaintiff believes and alleges that HCC has breached their duty of good faith and fair dealing by other acts and omissions, of which Plaintiff is presently unaware and which will be shown in the course of discovery.

229.    As a direct and proximate result of the conduct of HCC, the Plaintiff and the

Idaho Class Members have suffered, and will continue to suffer in the future, financial and other consequential damages, for a total amount to be shown at the time of trial.

230.    As a further proximate result of the aforementioned conduct of HCC, Plaintiff has been compelled to retain legal counsel to obtain the benefits due under the policy.  Therefore, HCC is liable to Plaintiff for those attorneys' reasonably necessary fees in an amount to be determined at the time of trial.

<u>**Ninth Claim for Relief**</u>

**INSURANCE BAD FAITH**

**(By Plaintiff Lacy, on Behalf of the Idaho Class, Against Defendants)**

231.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

232.    Plaintiff Lacy (for the purposes of this Count, "Plaintiff") brings this Count against Defendants on behalf of the Idaho Class.

233.    Defendants breached their obligations as Plaintiff's insurer, committing the tort of insurance bad faith.

234.    Defendants' conduct includes and amounts to intentionally and unreasonably denying and/or withholding payment.

235.    The wrongfulness of Defendants' denial of Plaintiff's claim is not fairly debatable, and was not the result of a good faith mistake.

236.    The consequences and harms of Defendants' actions, which include physical injury, emotional, and financial damages, are not fully compensable by contract damages.

237.    On information and belief, Defendants bad faith practices are committed with such frequency and regularity in Idaho as to indicate a business practice.

238.    Accordingly, Plaintiff seeks recovery of the claim with interest, an award of all applicable damages, including punitive damages, costs, and attorneys' fees.

### **Tenth Claim for Relief**

**SOUTH DAKOTA DECEPTIVE TRADE PRACTICES & CONSUMER PROTECTION ACT**
**SDCL §§ 37-24-1** *et seq.*
**(By Plaintiff Bryant, on Behalf of the South Dakota Class, Against Defendants)**

239.     Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

240.     Plaintiff Bryant (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against Defendants on behalf of the South Dakota Class.

241.     At all relevant times, Plaintiff has been entitled to the rights, protections, and benefits of the South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL §§ 37-24-1 *et seq.*, and other South Dakota law.

242.     Defendants' violations caused loss of Plaintiff's and South Dakota Class Members' money and property.

243.     Plaintiff and South Dakota Class Members suffered additional injuries in the form of out-of-pocket medical costs incurred due to Defendants' acts.

244.     The conduct described throughout this complaint took place in the State of South Dakota and harmed South Dakota consumers.

245.     The conduct by Defendants described herein constitutes, without limitation:

   a.     knowingly acting, using, or employing a deceptive act or practice, fraud, false pretense, false promises, or misrepresentation; and/or

   b.     concealing, suppressing, or omitting material facts in connection with the sale or advertisement of a service.

246.     Defendants failed to communicate, in bad faith, material facts within their knowledge that Plaintiff had no means of ascertaining.  These facts include, but are not limited to: that Defendants employ a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period; that Defendants engage in unlawful post-claims underwriting; that Defendants employ unlawful claims handling procedures, including deliberately preventing policyholders from satisfying burdensome document

requirements and training customer service representatives to discourage policyholders from seeking payment or pursuing an appeal; and that Defendants employ the services of unlicensed brokers who use misleading sales tactics.

247.    Defendants' practices are likely to deceive the public.  A reasonable consumer would be deceived by Defendants' statements and omissions in the selling of HCC's short-term health insurance policies—including Defendants' failure to disclose the "five-year look-back" policy—and Plaintiff and members of the South Dakota Class have in fact been deceived. Injuries will continue to accrue if Defendants do not abate their conduct.

248.    Plaintiff and South Dakota Class Members justifiably relied upon Defendants' misstatements and omissions.

249.    Defendants' practices are unfair, unscrupulous, and injurious to consumers.  They are contrary to the public policy of the State of South Dakota, as embodied in SDCL § 37-24-6, SDCL §§ 58-12-31 *et seq.*, and SDCL §§ 58-33-66 *et seq.*, as well as of the United States, as codified in the ACA.

250.    Defendants' practices are unfair, and injurious to competition, because they allow Defendants to undercut competitors' prices, and create an incentive for competitors to pursue similarly unscrupulous and deceptive tactics.

251.    Defendants' practices are likely to cause, and do cause, substantial injuries to consumers, which are not outweighed by a countervailing benefit to consumers or competition. Such injuries cannot reasonably be avoided by consumers.

252.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices as set forth above, Defendants have been unjustly enriched by Plaintiff's payment of consideration in the purchase of their insurance policies.

253.    Accordingly, Plaintiff is entitled to an order (i) enjoining the practices complained of herein, (ii) actual damages suffered as a result of Defendants' deceptive acts and practices, and (iii) other relief that the Court may find just and proper.

**Eleventh Claim for Relief**

**INSURANCE BAD FAITH**

**(By Plaintiff Bryant, on Behalf of the South Dakota Class, Against Defendants)**

254.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

255.    Plaintiff Bryant (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against Defendants on behalf of the South Dakota Class.

256.    Defendants have acted in bad faith toward Plaintiff, thereby committing the tort of insurance bad faith.  Defendants acts of bad faith, described throughout this complaint, include but are not limited to:

        a.    denying or constructively denying claims without a reasonable basis;

        b.    knowingly or recklessly disregarding the lack of a reasonable basis for such denials;

        c.    knowingly or recklessly failing to conduct a reasonable investigation concerning each claim; and

        d.    consciously engaging in wrongdoing during the processing of claims.

257.    On information and belief, Defendants' bad faith practices are committed with such frequency as to indicate a business practice.

258.    Accordingly, Plaintiff seeks recovery of damages with interest, an award of punitive damages, costs, and attorneys' fees.

**Twelfth Claim for Relief**

**BREACH OF CONTRACT**

**(By Plaintiff Bryant, on Behalf of the South Dakota Class, Against HCC)**

259.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

260.    Plaintiff Bryant (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against HCC on behalf of the South Dakota Class.

49

261.    The policies that HCC sold Plaintiff, combined with the timely payment of premiums amounted to legally enforceable promises and obligations owed via contract.

262.    By accepting the premium payments from Plaintiff, HCC agreed to timely process, reasonably investigate, and pay claim amounts for certain medical expenses according to the terms of the policies.

263.    In practice, however, HCC fails to abide by their contracts with policyholders. Specifically, HCC employs a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period, and deny policyholder claims based on medical conditions suffered well before the disclosed period, in violation of these contracts.

264.    Moreover, when HCC failed to perform timely process claims and make payments required by the policies, they breached contractual duties owed to Plaintiff. Specifically, the delays associated with HCC's obstructionist tactics violate its contractual duty to pay benefits as soon as HCC receives a proof of loss form.

265.    HCC's breaches caused damage to Plaintiff and/or South Dakota Class Members including but not limited to: interest and penalties charged by medical facilities on amounts due and outstanding; costs incurred to force HCC to perform their contractual obligations, make necessary payments, and enforce Plaintiff's policies; lost time from work as a result of repeated calls to HCC or otherwise attempting to track down information related to Plaintiff's claims; medical treatments foregone or not pursued because of the fear of denial, incurring more debt, and additional harassment from collection or billing personnel at medical facilities; and interest on the claim amounts that were improperly denied.

266.    Plaintiff and South Dakota Class Members owe monies to certain medical providers for reasons directly and proximately related to HCC's denials, and HCC continues to be in breach of their insurance contracts.

267.    The breaches by HCC have been material, going to the heart of the contract.

268.    All damages sustained by Plaintiff and South Dakota Class Members are the result of HCC's breach of obligations owed the Plaintiff and South Dakota Class Members under

the policies they purchased.  Plaintiff and South Dakota Class Members are entitled to damages, including damages sustained and a refund of premiums.

**Thirteenth Claim for Relief**

**BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**

**(By Plaintiff Bryant, on Behalf of the South Dakota Class, Against HCC)**

269.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

270.    Plaintiff (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against HCC on behalf of the South Dakota Class.

271.    Through the unlawful "five-year look-back" and unlawful post-claims underwriting—and the attendant, unduly burdensome records requests that arise from those policies, acts, and practices—HCC unreasonably denied Plaintiff coverage for care that was covered under his insurance policy.

272.    Without exclusion, HCC also trained their customer service representatives to consciously mislead, obstruct, and delay Plaintiffs seeking payment of claims.  This claims-handling conduct was a matter of company policy and was without proper cause.

273.    HCC's claims handling practices demonstrate a refusal to cooperate and a denial to Plaintiff of the full benefit of performance.

274.    HCC engaged in a pattern and practice of unreasonably failing to give at least as much consideration to its insureds' interests as it gave its own interests, in the investigation and handling of claims.

275.    HCC has committed institutional bad faith.  HCC's institutional bad faith amounts to reprehensible conduct because the conduct is part of a repeated pattern of unfair practices and not an isolated occurrence.  The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in the established company policies of HCC.

276.    Plaintiff believes and alleges that HCC has breached their duty of good faith and fair dealing by other acts and omissions, of which Plaintiff is presently unaware and which will

be shown in the course of discovery.

277.    As a direct and proximate result of the conduct of HCC, Plaintiff and South Dakota Class Members have suffered, and will continue to suffer, financial and other consequential damages, for a total amount to be shown at the time of trial.

278.    All damages sustained by Plaintiff and South Dakota Class Members are the result of HCC's breach of obligations owed the Plaintiff and South Dakota Class Members under the policies they purchased.  Plaintiff and South Dakota Class Members are entitled to damages, including damages sustained and a refund of premiums.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of the Class, pray for judgment and relief against Defendants as follows:

A.    For an order certifying the case as a class action and appointing Plaintiffs and Plaintiffs' counsel to represent the Class;

B.    For an order awarding, as appropriate, damages to Plaintiffs and Class Members, including all monetary relief to which Plaintiffs and Class Members are entitled under the applicable law;

C.    For an order requiring Defendants to immediately cease and desist their unlawful, deceptive, and obstructive practices with respect to the sales, claims processing, and customer service connected with their health insurance policies;

D.    For an order requiring Defendants to establish a common fund for the payment of medical expenses and incidental damages incurred by Plaintiffs and the Class as a result of their practices;

E.    For an order awarding attorneys' fees and costs;

F.    For an order awarding treble damages;

G.    For an order awarding pre-judgment and post-judgment interest; and

H.    For an order providing such further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: January 3, 2018

COHEN & MALAD, LLP

s/Vess A. Miller_____
Irwin B. Levin (No. 8786-49)
ilevin@cohenandmalad.com
Richard E. Shevitz (No. 12007-49)
rshevitz@cohenandmalad.com
Vess A. Miller (No. 26495-53)
vmiller@cohenandmalad.com
Lynn Toops (No. 26386-49A)
ltoops@cohenandmalad.com
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Rachel Geman
rgeman@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013-1413
(212) 355-9500

Elizabeth J. Cabraser
ecabraser@lchb.com
Michelle A. Lamy
mlamy@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
(415) 956-1000

CARNEY BATES & PULLIAM, PLLC
Allen Carney
acarney@cbplaw.com
David Slade
dslade@cbplaw.com
519 W. 7th Street
Little Rock, AR  72201
(501) 312-8500

CUNEO GILBERT & LADUCA, LLP
Michael J. Flannery
mflannery@cuneolaw.com
7733 Forsyth Boulevard, Suite 1675
Clayton, MO 63105
(314) 226-1015

Matthew Prewitt
mprewitt@cuneolaw.com
16 Court Street, Suite 1012
Brooklyn, NY 11241
(202) 789-3960

MEHRI & SKALET
Jay Angoff
jay.angoff@findjustice.com
1250 Connecticut Avenue, NW, Suite 300
Washington, D.C. 20036
(202) 822-5100

*Attorneys for Plaintiffs and the Proposed Class*