## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| **KEVIN BRYANT** and **GUILLERMO DELGADO**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**HCC MEDICAL INSURANCE SERVICES, LLC**, **HCC LIFE INSURANCE COMPANY**, and **HEALTH INSURANCE INNOVATIONS, INC.**,<br><br>Defendants. | CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br><br>No. 1:18-cv-00018-TWP-MPB |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kevin Bryant and Guillermo Delgado ("Plaintiffs"),[1] on behalf of themselves and all others similarly situated, individually and as class representatives, bring this multi-state class action against defendants HCC Medical Insurance Services, LLC and HCC Life Insurance Company (collectively, "HCC") and Health Insurance Innovations, Inc. ("HII"). Plaintiffs' allegations are based upon information and belief, except for the allegations concerning Plaintiffs' own actions.

## I.   **NATURE OF THE ACTION**

1.     This is a class action against HCC and HII (collectively, "Defendants"), seeking declaratory and injunctive relief, equitable relief, and damages. Defendants engage is a uniform and fraudulent course of conduct, and they knowingly breach contracts in a uniform manner.

---

[1] Former plaintiffs Mark Aliquo and Timothy Lacy no longer seek to represent the classes in this matter. Mr. Aliquo settled his individual claims against Defendants. Mr. Lacy—an Idaho resident who works in Washington—believed that he had an Idaho policy until Defendants provided him with a copy of that policy (for the first time) through this litigation. *See* ECF No. 42-1, Ex. 2. Because Mr. Lacy has a Washington policy, he agrees that his claims are not properly included in this matter. Mr. Aliquo's and Mr. Lacy's notices of voluntarily dismissal are filed concurrently with this First Amended Class Action Complaint.

2.      Defendants promise policyholders one thing and actually provide the opposite. They commit to providing short-term medical insurance with a pre-existing condition exclusion as short as *six months* and only as long as two years, and to promptly paying any claims arising during the period of coverage in a period as short as one month.  Defendants never do this. Instead, Defendants engage in a fraudulent and unlawful "five-year look-back" at policyholder medical records, in an effort to either: (1) locate a pre-existing condition well beyond the contracted-to period, in order to use that condition as the basis to deny a valid claim; or (2) locate a medical condition that would have made the policyholder ineligible for Defendants' insurance in the first place, a practice known as "post-claims underwriting."  When Defendants cannot locate either a pre-existing or disqualifying condition, they instead claim they are in need of difficult to obtain and legally irrelevant medical records and/or pretend not to have medical records already in their possession, in an effort to delay policyholder claims to the point of constructive denial.  This conduct, and the enterprise through which it operates, violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, the law of contract in each state in the multi-state classes, and the state statutory and common law of the states where the named plaintiffs and class representatives reside.

## II.   PARTIES

3.      Defendant HCC Medical Insurance Services, LLC ("HCCMIS") is a limited liability company established in 1998, with its headquarters at 251 North Illinois Street, Suite 600, Indianapolis, Indiana 46204.  HCCMIS was acquired by Tokio Marine Holdings, LLC in 2015.  According to its website, HCC is regulated by the State of Indiana as a Third Party Administrator.  HCCMIS writes insurance policies on behalf of HCC Life Insurance Company.

4.      Defendant HCC Life Insurance Company ("HCC Life") is a subsidiary of Tokio Marine Holdings, LLC and has its principal place of business at 225 TownPark Drive, Suite 350 Kennesaw, Georgia 30144.  HCC Life is the underwriter of HCC's short-term insurance policies complained of herein.

5.      Defendant Health Insurance Innovations, Inc. ("HII") is a publicly traded

Delaware corporation, with its corporate headquarters at 15438 N. Florida Avenue #201, Tampa, Florida 33613.  HII has been selling health insurance contracts since 2008.

6.     Plaintiff Kevin Bryant is a United States citizen, domiciled in Box Elder, South Dakota.  He contracted with HCC for a short-term insurance policy beginning January 2017 and continuing through July 2017.

7.     Plaintiff Guillermo Delgado is a United States citizen, domiciled in Dixon, California.  He contracted with HCC for a short-term insurance policy beginning July 2016 and continuing through January 2017.

## III.   JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendants are of diverse citizenship, and pursuant to 28 U.S.C. § 1332(d)(2), because this is a class action in which the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs; there are at least one hundred (100) class members; and at least two-thirds of the members of the putative classes are citizens of a state other than Defendants' state(s) of citizenship.  This Court also has federal question jurisdiction under 28 U.S.C. § 1331, ancillary jurisdiction over any state law claims under 28 U.S.C. § 1367, and jurisdiction based on RICO, 18 U.S.C. § 1965(a).

9.     This Court has personal jurisdiction over HCC because it has conducted systematic and continuous business activities in and throughout the State of Indiana and has its principal place of business there.

10.    This Court has personal jurisdiction over HII because it has conducted systematic and continuous business activities in and throughout the State of Indiana.  In the course of conducting business related to the sale and administration of the short term healthcare plans at issue in this litigation, HII has made millions of dollars per year.

11.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 because Defendants conduct business in Indiana, and because a substantial portion of the events giving rise to these claims occurred in this District, including the events related to Plaintiffs' claims.

Venue is also appropriate in this District pursuant to 18 U.S.C. § 1965.

## IV.   FACTUAL ALLEGATIONS

### A.   Short-Term Medical Insurance

12.     This case concerns short-term medical ("STM" or "short-term") insurance plans. Short-term insurance provides limited coverage, is targeted to particularly vulnerable buyers, and is exempt from the consumer protections contained in the federal Patient Protection and Affordable Care Act ("ACA").  Those protections include the ACA's prohibition on discrimination based on pre-existing conditions, its prohibition on annual and lifetime limits, its requirement that policies contain certain minimum benefits, and its requirement that insurers return to policyholders, in claims payments, at least 80% of the premiums they collect.  Because short-term insurance provides such limited coverage, those who purchase it, like those who purchase no coverage at all, are subject to a tax penalty under the ACA.

13.     Notwithstanding its deficiencies, Plaintiffs do not challenge the sale or administration of short-term insurance in ways that comply with the law.  But Defendants' marketing and claims processing procedures are purposely engineered and uniformly applied to accomplish the delay and denial of valid claims, rendering their short-term insurance products effectively worthless and violating federal and state law in the process.

### B.   Defendants' Unlawful Marketing, Sale, and Administration of Short-Term Medical Insurance

14.     Defendant HCC has historically been the largest short-term insurer in the nation. HCC contracts with policyholders to provide Defendants' STM products and underwrites the STMs through HCC Life.

15.     Defendant HII is a Third Party Administrator ("TPA") that solicits insurers, like HCC, to underwrite STMs and then organizes an operation of insurance brokers to sell those STMs.  HII engages in the administration of some STMs by, for example, providing billing services and operating the online portal through which policyholders may access their policy documents.

4

16.     Defendants began jointly developing, marketing, selling, and administering HCC's short-term insurance plans in July 2013, at the latest.[2]  In a press release announcing the endeavor between the parties, HII stated, *inter alia*, that the STM would be "launch[ed]...through [HII's] partnership with HCC Life Insurance Company," further characterizing the STM as a "robust addition to HII's suite of STM products."[3]  The President and CEO of HII further stated:

> HII's new short-term medical plan with HCC is being launched in 45 states and will enhance our national presence by providing a competitive product that meets the needs of today's consumers.[4]

17.     During the Class Period, Defendants developed, marketed, sold, and administered their short-term insurance plans in at least 45 states, including California, Indiana, and South Dakota.[5]  Based on Defendants' own representations and upon regulatory proceedings related to the STMs at issue, Plaintiffs believe and allege that Defendants acted in concert at most if not all junctures in all aspects related to these STMs.

18.     Defendants systematically fail to comply with the legal requirements to which they are subject, robbing policyholders of the services Defendants are legally obligated to deliver.  Specifically, Defendants violate the law through employing an undisclosed and unlawful "five-year look-back," through which they: (1) extend their pre-existing conditions exclusion well beyond the contracted-to period of six, twelve, or twenty-four months, in search of a condition to use as the basis to deny a valid claim; (2) engage in post-claims underwriting, in search of a condition that would have made the policyholder ineligible for Defendants' insurance in the first place; and (3) delay policyholder claims to the point of constructive denial, by claiming they are constantly in need of difficult to obtain and legally irrelevant medical records

---

[2] *See* HII Press Release, *Health Insurance Innovations Partners With HCC Like Insurance Company to Expand Short-Term Medical Portfolio*, (Jun. 3, 2013), available at http://investor.hiiquote.com/releasedetail.cfm?ReleaseID=775244 ("HII's new short-term medical plan with HCC is being launched in 45 states and will enhance our national presence by providing a competitive product that meets the needs of today's consumers.").
[3] *Id.*
[4] *Id.*
[5] *See supra* n.1.

and/or by pretending not to have medical records already in their possession.

### 1. <u>Defendants' "Five-Year Look-Back"</u>

19.     Defendants systematically exclude coverage or delay payment through employing a "five-year look-back" at the medical records of any policyholder who submits a claim.

20.     When a policyholder submits a claim, Defendants first require the policyholder to submit a "proof of loss form" to receive payment on the claim.  Defendants then require policyholders to submit **five years** of medical records.

21.     This five-year look-back practice is not disclosed to prospective purchasers of HCC's insurance.  Rather, the first time that policyholders are informed of the five-year look-back is at a time when they are especially vulnerable, having just suffered from the distress of a recent hospitalization or other medical incident.

### a. <u>Breach of Contract</u>

22.     Defendants' five-year look-back violates the terms of HCC's contract with policyholders.

23.     In the "Exclusions" section of the STM, Defendants disclose a pre-existing condition exclusion of six, twelve, or twenty-four months.  For example, Plaintiff Delgado's policy read as follows, in pertinent part:

> Charges for the following treatments and/or services and/or supplies and/or conditions are excluded from coverage:
>
> 1. Pre-existing Conditions – Charges resulting directly or indirectly from a condition for which a Covered Person received medical treatment, diagnosis, care or advice **within the six (6) month period immediately preceding such person's Effective Date** are excluded for the first six (6) months of coverage hereunder.

(Emphasis supplied.)

24.     In the "Claim Provisions" part of the STM, Defendants further represent that benefits will be paid out in a timely manner.  For example, Plaintiff Bryant's policy read as follows, in pertinent part: "Benefits for loss covered by this policy will be paid **as soon as we**

**receive proper written proof** of such loss."  (Emphasis supplied.)

25.     In practice, however, Defendants fail to abide by these contract provisions.
Instead, Defendants search policyholders' medical records for evidence of any preexisting
condition during a much longer, undisclosed time period—**the previous five years**—and deny
policyholder claims based on medical conditions suffered well before the disclosed period.
Defendants' request for five years of medical records therefore directly contravenes HCC's
contracts with policyholders, which excludes coverage only for conditions for which the
policyholder received medical treatment, diagnosis, care, or advice within a shorter window—
**six, twelve, or twenty-four months**—preceding the effective date of coverage.

### b.     Post-Claims Underwriting

26.     When Defendants obtain medical records from policyholders through the five-
year look-back, they use these records to seek out purported medical conditions that would have
made the policyholder ineligible for HCC's insurance in the first place.  Once such a condition is
found, Defendants use it to justify denial of the policyholder's claim or the complete rescission
of the policy.  This practice is commonly known as "post-claims underwriting."

27.     Certain states, recognizing the categorical problems associated with post-claims
underwriting, have made the practice unlawful per se (even when disclosed).  As implemented
by Defendants, post-claims underwriting is also fraudulent and a breach of HCC's contract with
policyholders because Defendants intentionally and systematically fail to disclose that they
employ the practice, and use the practice as a vehicle to fraudulently deny claims, actually or
constructively.

### c.     Fraudulent Claims Handling

28.      Defendants' claims handling procedures are set up to prevent, and do
systematically prevent, policyholders from even being able to satisfy the burdensome records
requirement.  Defendants employ the five-year look-back to engage in a deliberately lengthy and
burdensome claims handling process, such that claims are processed—if at all—well after
Defendants have received "proper written proof of loss," in further violation of HCC's contract

with policyholders.

29.     Many policyholders who attempt to provide Defendants with the documents requested, either directly or through their health care providers, are prevented from doing so by Defendants' intentionally dilatory claims processing procedures.

30.     Defendants' customer service representatives delay the processing of claims by, among other tactics: requesting even more legally irrelevant records; ignoring policyholders' attempts to contact them; inventing reasons for why the provided documents are inadequate; falsely informing policyholders that their health care providers have been unable or unwilling to provide the requested records; and falsely asserting that they do not have records that are in fact in their possession.  In this way, Defendants employ the five-year look-back as a vehicle to delay—and constructively deny—valid claims.

31.     HCC also trains its customer service representatives, called Brand Care Specialists, to obstruct policyholders instead of helping them.  Upon information and belief, the majority of (if not all) customer service calls to HCC are transferred to Global Response Corporation, a third-party contractor whose employees—the Brand Care Specialists—are trained by HCC to handle HCC's customer service.

32.     Brand Care Specialists are forced to use a script provided by HCC that walks them through improper denial and obstruction of claims.  The script is designed to discourage policyholders from seeking payment on their claims or from successfully providing sufficient information to process existing claims.

33.     A disillusioned Brand Care Specialist described the training process on a public consumer protection forum, including HCC's threats that Brand Care Specialists would be "thrown under the bus" for deviating from HCC's intentionally obstructionist script:[6]

> Even internally it was obvious that the name of the game is
> runaround. . . .  [T]here was never any clarity as to what we were
> supposed to do to help people navigate the bureaucracy.  It really

---

[6] *HCCMIS – A View from the Inside*, available at https://hccmis.pissedconsumer.com/a-view-from-the-inside-20160424835550.html (last visited 12/11/2017).

felt like everything was designed to be so cumbersome that the customer would either get frustrated and give up or they could stall long enough to not have to pay out on the claim. I even think the idea was to get us so frustrated that we'd blow the customers off or just tell them we had received documents just to get them to go away. The whole idea here is that we're a legal buffer between HCC and you as was **made crystal clear in training when they said outright that we'd be thrown under the bus if we ever deviated from the script**; that HCC and Global Response would not protect us if legal action was directed at the company. Basically we'd be the bumper.

34.     Instead of helping resolve disputes, Brand Care Specialists are instructed by HCC to tell policyholders that their claims relate to pre-existing conditions and/or to discourage policyholders by falsely representing that the STM contains a more expansive pre-existing condition exclusion than actually set forth in the policy.

35.     HCC also deliberately prevents Brand Care Specialists from being able to seek answers to policyholders' questions. Policyholders frustrated or confused by Brand Care Specialists' misleading, deceptive, and obstructionist tactics have no recourse because Brand Care Specialists are not empowered to transfer policyholder calls to HCC. As the same individual stated on the consumer protection forum:[7]

As a "Brand Care Specialist" we were trained to work in HCC's systems and handle their calls but there was almost no support from the company HCC or Global. Not only did we take the most heart breaking calls from customers but also from hospitals and debit collectors looking to get information on claims to pursue the customer. . . . [P]erhaps most tragically if we wanted to help someone out the only real options were to post to an internal Microsoft SharePoint website and hope that someone took it to HCC or to pass it to another team member acting as manager to have an email sent to the same place that yours would go. The only way anything went somewhere was if the caller mentioned a lawsuit and at that point it was passed to the HCC legal team and we were instructed to end the call. I want to emphasize here that we had no way to contact HCC directly, or to interact with them (I'm guessing by design) so we had no way to ever get your issues addressed beyond what you could find out for yourself. . . .

The only [Brand Care Specialists] that can take it are the ones that can just parrot out the party line "Did you read your policy?", "Did you check the website?", "Did you send in the forms?" and basically convince themselves that it's always the customers fault.

_____

[7] *See supra* n.3.

That's right it's your fault for not taking a day or so and doing a through [sic] investigation on the company, you had/have no expectation of not being screwed.

. . . Even trying to help out a customer by using non-legal terms or walking them through the disheartening process of claims was cause for a "Coaching", that is management talk for a dressing down but not on the record.  So even the ability to explain things to you in terms you'd understand was tightly controlled.

It basically comes down to this; When you call in the people that are on the other line have no power, ZERO authority or means to help you out beyond what you can do for yourself on the websites. In my bosses words "We're just telling them what is on the website and what they can find out for themselves".

36.     Brand Care Specialists are further instructed by HCC to deceive policyholders who ask to appeal a denial of a claim, by telling them the matter has been escalated without actually escalating the matter until 60 days after the appeal is requested.  HCC, through its Brand Care Specialists, thus makes false statements to policyholders in order to induce them to stop seeking payment.

37.     Brand Care Specialists have reported myriad complaints to HCC.  HCC accordingly knew and knows, among other things, that there is widespread and intense customer dissatisfaction with its services and that attempts to secure payment from HCC are being denied and obstructed in bad faith.

### 2.     Investigations by State Regulators

38.     These fraudulent practices have captured the attention of state regulators.

39.     For example, in a recent filing, HCC stated that "[c]urrently, there is a multi-state market conduct examination ongoing related to the Company's practices on short term medical insurance."[8]  State insurance departments do routine market conduct examinations of the insurers domiciled in their state every three to five years.  Multi-state market conduct examinations, on the other hand, are not routine: they are conducted only of companies about whose market conduct multiple insurance departments have serious questions, regardless of their state of

---

[8] HCC Life Insurance Company, Statutory Financial Statements and Supplemental Schedules, December 31, 2016 and 2015.

domicile.  HII recently disclosed that the Indiana Department of Insurance is serving as the

managing participant of the multi-state examination, and that "the examination includes, among

other things, a review of whether [Defendants have] engaged in any unfair or deceptive acts or

non-compliant insurance business practices."[9]  To date, at least forty-two states have joined the

multi-state examination.

40.     Defendants' unlawful conduct also triggered an investigation by the Montana

Commissioner of Securities and Insurance ("CSI").  In a May 9, 2016 Notice of Proposed

Agency Action,[10] the CSI found that Defendants "routinely" sell STMs "through misinformation

and deception" and concluded that Defendants "violated [Montana law] by making statements

and omissions which misrepresented the terms" of their STMs, including "by misrepresenting

pertinent facts or policy provisions."

41.     HII has received cease and desist letters from, at least, the states of Michigan (on

May 1, 2014) and Arkansas (on March 28, 2016).  These letters noted that HII was selling short-

term insurance plans through unlicensed brokers and/or through misinformation and deception.

Upon information and belief, Defendants knowingly worked with unqualified and unlicensed

brokers who used common unscrupulous and dishonest tactics to sell HCC's insurance policies.

42.     HII also recently disclosed that it is under investigation by the Massachusetts

Attorney General's Office and the Texas Department of Insurance,[11] and on June 1, 2017, the

Florida Office of Insurance Regulation "determined [HII] is not competent" and denied HII's

application for licensure as a third-party administrator.[12]

---

[9] Heath Insurance Innovations, Form 10-Q for the period ending June 30, 2017.

[10] See Montana Commissioner of Securities and Insurance, *Notice Of Proposed Agency Action And Opportunity For Hearing* (May 9, 2016), available at http://csimt.gov/wp-content/uploads/Notice-of-PAA.pdf.

[11] *See supra* n.6.

[12] Florida Office of Insurance Regulation, letter dated June 1, 2017.

C. **Plaintiffs' Experiences with HCC's Insurance**

1. **Plaintiff Bryant**

43. Plaintiff Kevin Bryant purchased an "HCC Advantage" short-term insurance policy, with an effective date of January 1, 2017 and for a six-month term.

44. Mr. Bryant purchased this policy through Agile Health Insurance.  He located the policy through an internet search for short-term insurance.  The application process was conducted entirely online, and he received confirmation of his coverage via email.  Mr. Bryant paid premiums of over $200 per month for his policy, to Agile Health Insurance.

45. Mr. Bryant was not informed that Defendants routinely demand five years of medical records, or that Defendants would use this onerous records request as a vehicle to deny valid claims and/or rescind coverage.

46. In mid-January 2017, Mr. Bryant suffered a back injury while golfing.  He was ultimately diagnosed with a herniated disc and underwent surgery to correct the herniation on January 30, 2017.

47. Following each visit with his healthcare providers during the period of coverage, Mr. Bryant's providers promptly and properly submitted claims to HCC for his treatment, which fell within the scope of Mr. Bryant's policy.  Yet HCC has, to date, refused to cover Mr. Bryant's claims.

48. Instead, subsequent to filing his claims, Mr. Bryant received letters from HCC stating that more information from providers was needed.  However, the letters were purposefully vague as to either the missing information or the specific records sought.

49. One such letter from HCC stated that information had been sought but was missing, and claims could not be processed accordingly.  But the letter did not identify the missing information, stating in its entirety:

> This letter is to notify you that additional information was previously requested of you or one of your medical providers; however this information is still outstanding.  Before any further consideration can be given to your claim, all information must be submitted.

> Please return this letter with the requested information to our office within 15 days of the date of this letter, and upon receipt, we will make a determination within 20 days. Failure to respond in a complete and timely manner may result in the denial of your claim(s).

Mr. Bryant received at least 139 of these letters between March 1, 2017 and the present.

50. Other letters from HCC made ambiguous and unduly burdensome requests for "Complete medical records from 1/1/2012 to current."

51. Despite these vague requests, Mr. Bryant worked in good faith to provide HCC with all requested records. Mr. Bryant confirmed with each of his providers that they had received HCC's requests for medical records and transmitted all requested records to HCC. In the course of providing records and following up on the status of his claim, Mr. Bryant called HCC repeatedly between January 2017 and the present.

52. However, despite Mr. Bryant's efforts to satisfy HCC's medical records request, HCC has unlawfully denied Mr. Bryant's claims. Mr. Bryant received several Explanation of Benefit ("EOB") forms dated November 29, 2017 and stating: "This file has been closed due to lack of requested information from the provider(s). We need a complete copy of medical records to reopen this file." Moreover, due to Defendants' delay tactics, at least one of Mr. Bryant's medical providers has sent his pending medical bills to a collections agency, thereby constructively denying Mr. Bryant's claim.

53. The medical bills at issue totaled more than $90,000.

54. Mr. Bryant's experience is consistent with Defendants' standard practice, which is systematically designed, implemented, and enforced by Defendants to effectuate the delay and denial of policyholders' valid claims. Had Mr. Bryant known the truth about Defendants' practices, he would not have purchased HCC's substandard insurance.

### 2. Plaintiff Delgado

55. Plaintiff Guillermo Delgado's wife purchased a short-term insurance policy with HCC—for herself and Plaintiff Delgado—with an effective date of July 19, 2016 and for a six-month term.

56.     Mrs. Delgado thought or believed that she located the policy through Covered California.[13]  The application process was conducted both online and over the phone, and the Delgados received confirmation of their coverage via email.  They paid premiums of $339.13 per month for their policy.

57.     Mr. and Mrs. Delgado were not informed that Defendants routinely demand five years of medical records, or that Defendants would use this onerous records request as a vehicle to deny valid claims and/or rescind coverage.

58.     In September 2016, Plaintiff Delgado sought treatment at the emergency room for difficulty swallowing.  He later underwent an endoscopy for diagnostic purposes, but never received a diagnosis for this issue.  Mr. Delgado previously underwent an endoscopy on April 24, 2015—nearly fifteen months prior to the effective date of his policy with HCC.

59.     Following his September 2016 medical visits, Mr. Delgado's medical providers promptly and properly submitted claims to HCC for his treatment, which fell within the scope of Mr. Delgado's policy with HCC.

60.     Instead of processing and paying Mr. Delgado's claims, HCC began sending onerous and legally unnecessary medical records requests to Mr. Delgado.  Beginning in late 2016, Mr. Delgado received letters from HCC stating that more information from providers was needed to process his claims.  However, the letters were purposefully vague as to either the missing information or the specific records sought.

61.     One such letter from HCC stated that information had been sought but was missing, and claims could not be processed accordingly.  But the letter did not identify the

---

[13] Covered California only offers qualified health plans that meet a number of state and federal standards, which the STMs at issue in this litigation do not.  Consumers are often confused into believing they have located health insurance through government-sponsored websites, when they have not.  It is possible that Mrs. Delgado was on a private website that linked to Covered California plans as well as short term plans, like the STMs at issue in this litigation.  *See, e.g.*, https://www.healthforcalifornia.com.  This would be consistent with practices observed by state regulators.  For example, in the 2016 Notice of Proposed Agency Action, the Montana CSI found:  "Those Montana consumers who enrolled through the HII entities initially started looking for insurance online.  All of the consumers believed that they entered their contact information on the government-sponsored ACA website."

missing information, stating in its entirety:

> This letter is to notify you that additional information was previously requested of you or one of your medical providers; however this information is still outstanding.  Before any further consideration can be given to your claim, all requested information must be submitted.
>
> Please return this letter with the requested information to our office within 15 days of the date of this letter, and upon receipt, we will make a determination within 20 days.  Failure to respond in a complete and timely manner may result in the denial of your claim(s).

Mr. Delgado received numerous such letters between late 2016 and the present.

62.     When the Delgados called HCC to get more information about the purportedly missing records, they were informed that HCC required "all" of Mr. Delgado's records.  Mr. Delgado explained that he had been covered through Kaiser Permanente for over thirty-five years, and asked whether HCC really needed all thirty-five years of his Kaiser medical records to evaluate his claims for treatment in September 2016.  The HCC representative responded that HCC did need over three decades of records to process Mr. Delgado's claims.

63.     Despite these vague requests, Mr. Delgado worked in good faith to provide HCC with all requested records.  He took time off of work in order to personally go  Kaiser Permanente and collect copies of the requested records for transmission to HCC.  However, HCC continued to deny that it had all of the information necessary to process Mr. Delgado's claims, and continued to send purposefully vague letters like those quoted above.

64.     HCC's delay tactics continued for over one year.  In the course of providing records and following up on the status of his claim, the Delgados called HCC repeatedly between late 2016 and January 2018.

65.     In January 2018, HCC finally conceded that it had all of Mr. Delgado's medical records.  Instead of processing and paying Mr. Delgado's claims, however, HCC denied the claims on the basis that they stemmed from a pre-existing medical condition.  On January 31, 2018, Mr. Delgado received an Explanation of Benefit ("EOB") form stating only: "Consequence/complication of pre-existing condition."  Thereafter, Mr. Delgado called HCC to

15

receive more detail regarding this denial, and was informed that his claim was denied because he had previously received the same procedure (an endoscopy) at Kaiser.

66.     Due to Defendants' delay tactics and ultimate unlawful denial, all of Mr. Delgado's medical providers have sent his pending medical bills to a collections agency.  The Delgados's credit has suffered considerably as a result.

67.     The medical bills at issue total more than $60,000.

68.     Mr. Delgado's experience is consistent with Defendants' standard practice, which is systematically designed, implemented, and enforced by Defendants to effectuate the delay and denial of policyholders' valid claims.  Had Mr. Delgado known the truth about Defendants' practices, he would not have purchased HCC's substandard insurance.

### D.     Complaints About HCC's Insurance

69.     Plaintiffs' experiences are typical examples of the experiences of myriad other victims.  Publicly available sources are replete with reviews where consumers complain of the identical sales, service, and claims processing issues concerning HCC's short-term insurance policies that are at issue here.  A small sample appears below ([sic] throughout):

a.     "S.L."[14]

> Horrible, bad, disgusting, irresponsible Insurance. I bought the short term Medical insurance for my husband on January 2015 while we were waiting for a long term insurance's confirmation. HCC approved my husband and me quickly because we had no major healthy issues in the past our record is clear. We paid our premium and officially under coverage. Unfortunately and unexpectedly, my husband had an heart attack and almost die. He was in the hospital for more than a month. For the next few months, I tried very hard to have HCC pay for our bills but they kept giving us hard time. With a husband who almost die and care for, I ran out of energy. I didn't even have energy to file a complain until now. The total amount HCC paid was $212.40.

---

[14]     *See* Better Business Bureau, *Profile: HCC Medical Insurance Services, LLC*, available at https://www.bbb.org/indy/business-reviews/insurance-health/hcc-medical-insurance-services-llc-in-indianapolis-in-90005439/reviews-and-complaints (last visited 12/11/2017).

b.    **"Rick"**[15]

It is with deep regret that I ever chose HCC health insurance. This was a mistake that has completely turned my life upside down. When I applied for this health coverage through my local insurance agent, I was led to believe that this coverage was good short term insurance and met the minimum Obama Affordable Care Act requirements. Recently I found out that this is not true. When I applied for this insurance I believed that I qualified for this coverage. Now after having a major heart attack in December and bills totaling about $66,000 I have been denied any coverage due to a doctor's note about 4 years ago stating that I have a degenerative disc in my lower back. I was told by my doctor that my discs were showing NORMAL wear from aging. He said that all adults have some form of this. My doctor did NOT call this a Disease. Degenerative disc is not a DISEASE - it is a NORMAL part of aging. When someone applies for coverage through this company it should be required to produce 5 years of medical records at that time so it is clear that patients are eligible for coverage. It is clear that they are more concerned about collecting premiums than doing the right thing. It seems maybe I would have been better off if I had not survived my heart attack. DO NOT EVEN CONSIDER THIS INSURANCE!

c.    **"Ann D."**[16]

I would NEVER, EVER suggest that anyone purchase insurance from HCC.  I have been fighting with them for nearly 10 months to pay medical claims.  Bills are now being sent to collections because of HCC excuses such as, "We need more records", "We didn't have your correct address".  That's the very short list; other comments were, "We don't have that provider on file" when they had sent a denial notice to the provider.  My favorite (NOT) was when speaking with a representative, I told her I had another question. Her response was, "I just closed your account on the computer, are you telling me you want me to open it again?".  Um, Yes, I am telling you I want you to open the account again.  Sheesh.  I've submitted a complaint to the State Insurance Commission and am considering legal action.  DO NOT use HCC.

d.    **"Golam"**[17]

File a claim on 03/21/2016, did not hear them for long time although their email said they will respond within 60 business

---

[15]    *See* Better Business Bureau, *Profile: HCC Medical Insurance Services, LLC*, available at https://www.bbb.org/indy/business-reviews/insurance-health/hcc-medical-insurance-services-llc-in-indianapolis-in-90005439/reviews-and-complaints (last visited 12/11/2017).

[16]    *See* Yelp, *HCC Medical Insurance Services*, available at https://www.yelp.com/biz/hcc-medical-insurance-services-indianapolis (last visited 12/11/2017).

[17]    *See* Better Business Bureau, *Profile: HCC Medical Insurance Services, LLC*, available at https://www.bbb.org/indy/business-reviews/insurance-health/hcc-medical-insurance-services-llc-in-indianapolis-in-90005439/reviews-and-complaints (last visited 12/11/2017).

days. I again contacted on 9/2/2016 and they said they will get back in 30 days which they did not. Now today (1/10/2017) contacted and their initial response was I don't have any claim filed. After a long wait, they could find my previous notes and now claiming I need to send some some extra information which was not listed in their claim form. So basically either they are lying or trying to put me in some of their "fine printing" loophole. I would appreciate their requirement if they send me those after my first claim filing. But they did not respond and each time they are trying to tell me a new story. So basically its a fraudulent company and govt. should close it down ASAP.

        **e.**        **"Erica M."[18]**

Completely outraged with this company.  I was looking for a full medical plan and the person me on the phone told me that's what I would be getting and signed me up for a short term plan instead.  I should have read over my policy sooner, however I believe this is an unethical company.  Now I will pay 2% of my income at the end of the year, plus the $175/month I paid to this company.  Didn't even cover my OBGYN.  That goes toward the deductible. I feel defeated and have spent the morning crying :(

## V.    TOLLING

### A.    Discovery Rule Tolling

70.    Plaintiffs and Class Members had no way of knowing about Defendants' practices with respect to the sale of insurance and administration of claims because Defendants hid the fact that they employ the five-year look-back as a vehicle to deny valid claims, delay valid claims to the point of constructive denial, or void policies through post-claims underwriting.

71.    Within the period of any applicable statutes of limitation, Plaintiffs and Class Members could not have discovered through the exercise of reasonable diligence that Defendants were hiding their true practices.

72.    All applicable statutes of limitation have been tolled by operation of the discovery rule.

### B.    Fraudulent Concealment Tolling

73.    Instead of disclosing its true practices, Defendants knowingly and falsely

---

[18]   *See* Yelp, *HCC Medical Insurance Services*, available at https://www.yelp.com/biz/hcc-medical-insurance-services-indianapolis (last visited 12/11/2017).

represented that HCC was a reputable insurance company that paid claims.

74.     All applicable statutes of limitation have therefore also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

**C.     Estoppel**

75.     Defendants were under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of their insurance scam.

76.     Instead, Defendants knowingly, affirmatively, and actively concealed the true facts from policyholders.

77.     Based on the foregoing, Defendants are also estopped from relying on any statutes of limitations in defense of this action.

**VI.     CLASS ACTION ALLEGATIONS**

78.     This action is brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs bring this action on behalf of themselves and others similarly situated.

79.     First, Plaintiffs seek to represent a Multi-State RICO Class against all Defendants consisting of Class Members from states where Defendants disclose a six-, twelve-, or twenty-fourth-month pre-existing condition exclusion.  Those states are:  California (6 months); Colorado (12 months); Connecticut (24 months); Georgia (12 months); Idaho (6 months); Illinois (24 months); Maine (12 months); New Hampshire (24 months); New Mexico (6 months); North Dakota (24 months); South Dakota (12 months); Utah (24 months); Virginia (12 months); and Wyoming (6 months) (collectively, the "Covered States").  The proposed Multi-State RICO Class may be defined as:

> The Multi-State RICO Class consists of all individuals in the Covered States who: (1) purchased one of HCC's short-term health insurance policies in a Covered State; (2) used HII as a broker at purchase and/or were billed by HII or Agile Health Insurance; and (3) had at least one claim denied, either formally or constructively, and/or had their policy rescinded, since a date to be ascertained through discovery.

80.     Plaintiffs also seek to represent a Multi-State Breach of Contract Class against HCC in the Covered States.  The proposed Multi-State Breach of Contract Class may be defined as:

> All individuals who: (1) purchased one of HCC's short-term health insurance policies in the Covered States; and (2) had at least one claim denied, either formally or constructively, and/or had their policy rescinded, since a date to be ascertained through discovery.

81.     In addition to the Multi-State RICO and Multi-State Breach of Contract Classes, Plaintiffs seek to represent state-based Classes consisting of Class Members from California and South Dakota, as well as any additional state-based Classes; subclasses; or common question "issue" Classes that Plaintiffs may propose and/or the Court may designate under Rule 23(b)(1), (b)(2), (b)(3), and/or (c)(4) at the time of class certification.  The State Classes may be defined as follows:

> California Class:
>
> The California Class consists of all individuals who: (1) purchased one of HCC's short-term health insurance policies in California; and (2) had at least one claim denied, either formally or constructively, and/or had their policy rescinded, since a date to be ascertained through discovery.
>
> South Dakota Class:
>
> The South Dakota Class consists of all individuals who: (1) purchased one of HCC's short-term health insurance policies in South Dakota; and (2) had at least one claim denied, either formally or constructively, and/or had their policy rescinded, since a date to be ascertained through discovery.

82.     The Multi-State RICO Class, Multi-State Breach of Contract Class, and State Classes are collectively referred to as the "Class" in this Complaint.

83.     Excluded from the Class are Defendants, any entity in which Defendants have or had a controlling interest or which have or had a controlling interest in any Defendant, and Defendants' legal representatives, assigns, and successors.  Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

84.     Plaintiffs reserve the right to amend or modify the Class definitions in connection with a motion for class certification or as warranted by discovery.

85.     The Class seeks the injunctive relief of a practice change under Rule 23(b)(2) that requires insurance claims processing to adhere to the law (including, at a minimum, the cessation of the five-year look-back, post-claims underwriting, and fraudulent claims-handling practices).

86.     Class Members also seek a class under Rule 23(b)(3) for monetary recoveries sustained as a result of Defendants' misconduct.

87.     The Class meets the requirements of Rule 23(a), Rule 23(b)(2), and/or Rule 23(b)(3).

88.     <u>Numerosity</u>:  Plaintiffs do not know the exact size or identities of the proposed Class, however, Plaintiffs believe that the Class encompasses thousands of individuals who are dispersed geographically throughout the Covered States.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.  The Class is ascertainable by Defendants' records, and Class Members may be notified of the pendency of this action by mail and/or electronic mail, supplemented if deemed necessary or appropriate by the Court by published notice.

89.     <u>Existence and Predominance of Common Questions of Fact and Law</u>:  There are questions of law and fact that are common to the Class, which predominate over any questions affecting only individual members of the Class.  The damages sustained by Plaintiffs and Class Members flow from the common nucleus of operative facts surrounding Defendants' misconduct.  The common questions include, but are not limited to the following:

a.      whether Defendants employed a "five-year look-back" at legally irrelevant medical records;

b.      whether Defendants engaged in post-claims underwriting;

c.      whether Defendants employed unlawful claims-handing processes, whereby they deliberately delayed the processing of valid claims;

d.      whether Defendants' policies and procedures codified or effected

systematic omissions and/or misrepresentations, breaches of contract, or other illegalities;

e.     whether a reasonable consumer would consider Defendants' omissions and/or misrepresentations material in purchasing Defendants' health insurance policies;

f.     whether, as a result of Defendants' omissions and/or misrepresentations of material facts, Plaintiffs and Class Members have suffered a loss of monies and/or property and/or value;

g.     whether Defendants' conduct violated the laws of the States in which they operated;

h.     whether Defendants committed criminal acts;

i.     whether Defendants acted as part of an enterprise; and

j.     whether Plaintiffs and Class Members are entitled to monetary damages and/or other remedies and, if so, the nature of any such relief.

90.    <u>Typicality</u>:  Plaintiffs' claims are typical of the Class' claims, because Plaintiffs and the Class sustained damages arising out of Defendants' wrongful conduct, and because Plaintiffs and the other members of the Class have an interest in preventing Defendants from engaging in such activity in the future.

91.    <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in class and consumer litigation and have no conflict of interest with Class Members in the maintenance of this class action. Plaintiffs will vigorously pursue the claims of the Class.

92.    <u>Superiority</u>:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation makes it impracticable for Class Members to individually seek redress for the wrongs done to them.  Plaintiffs believe that Class Members, to

the extent they are aware of their rights against Defendants herein, would be unable to secure counsel to litigate their claims on an individual basis because of the relatively small nature of the individual damages, and that a class action is the only feasible means of recovery for Class Members.  Individual actions also would present a substantial risk of inconsistent decisions, even though each Class Member has an identical or substantially similar claim of right against Defendants.  Plaintiffs envision no difficulty in the management of this action as a class action.

93.     A Rule 23 (b)(2) class for injunctive relief is warranted because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## CLAIMS FOR RELIEF

### First Claim for Relief

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**
**Violation of 18 U.S.C. § 1962(c)-(d)**

**(By Plaintiffs, on Behalf of the Multi-State RICO Class, Against Defendants)**

94.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

95.     Plaintiffs bring this Claim for Relief on behalf of the Multi-State RICO Class against Defendants HCC and HII (for the purposes of this Claim for Relief, the "RICO Defendants").

96.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

97.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.  18 U.S.C. § 1962(d).

98.     As explained below, the RICO Defendants violated Sections 1962(c) and (d).

A.     **The RICO Defendants Engaged in a Scheme to Defraud**

99.     The purpose of the RICO Enterprise, defined below, was to deceive policyholders about the true nature of the RICO Defendants' STM products and extract premiums from Plaintiffs and the Multi-State RICO Class for what were effectively worthless insurance policies. The motivation was simple:  to increase the RICO Defendants' revenues and profits.

100.     In devising and executing the illegal scheme, the RICO Defendants knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Multi-State RICO Class or to obtain money from Plaintiffs and the Multi-State RICO Class by means of materially false or fraudulent pretenses, representations, promises, omissions of material facts, and unfair and unconscionable business practices.

101.     Specifically, the RICO Defendants' marketing and claims processing procedures are purposely engineered and uniformly applied to accomplish the delay and denial of valid claims and/or rescission of valid policies.

102.     The RICO Defendants begin by engaging in serial and uniform misrepresentations and omissions to Plaintiffs and Multi-State RICO Class Members, as described above.  Indeed, as described above, in a 2016 Notice of Proposed Agency Action, the Montana CSI found that the RICO Defendants and other members of the RICO Enterprise "routinely" sell STMs "through misinformation and deception."  The CSI concluded that the RICO Defendants "violated [Montana law] by making statements and omissions which misrepresented the terms" of their STMs, including "by misrepresenting pertinent facts or policy provisions."  It is through such serial and uniform misrepresentations that the RICO Defendants first induce Multi-State RICO Class Members to purchase their STM products.

103.     Then, upon submitting claims, Multi-State RICO Class Members are required to provide *every single medical record* from the last five years of their medical history, regardless of whether such records relate to the claim at issue and notwithstanding that this requirement is not disclosed in advance.  As described above, the RICO Defendants use this requirement to either: (i) locate a pre-existing condition well beyond the contracted-to period and deny the

24

claim; (ii) locate a disqualifying medical condition and retroactively void the policy, a practice known as "post-claims underwriting"; or (iii) delay policyholder claims to the point of constructive denial. Indeed, the Montana CSI found that through these unlawful practices, "valid claims . . . are routinely denied under these policies" and that the RICO Defendants and other members of the RICO Enterprise thereby "violated [Montana law] in their claim handling practices."

104. This scheme to defraud extends far beyond Montana—it extends across the United States,[19] including in each Covered State.

**B.    The RICO Defendants Have Used Mail and Wire Facilities in Furtherance of their Scheme to Defraud**

105. To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the RICO Enterprise, defined below, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

106. Specifically, as alleged herein, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. The multiple acts of racketeering activity the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the RICO Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or

---

[19] *See* HII Press Release, *Health Insurance Innovations Partners With HCC Like Insurance Company to Expand Short-Term Medical Portfolio*, (Jun. 3, 2013), available at http://investor.hiiquote.com/releasedetail.cfm?ReleaseID=775244 ("HII's new short-term medical plan with HCC is being launched in 45 states and will enhance our national presence by providing a competitive product that meets the needs of today's consumers.").

foreign commerce.

107.     The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.  For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

108.     The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a.     <u>Mail Fraud</u>:  The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to defraud and obtain money by means of false pretenses, misrepresentations, promises, and omissions.

b.     <u>Wire Fraud</u>:  The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money by means of false pretenses, misrepresentations, promises, and omissions.

109.     The RICO Defendants' uses of the mails and wires include, but are not limited to, the transmission or delivery of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of the RICO Defendants' illegal scheme:

a.     sales and marketing materials, including advertising, websites, and brochures, concealing the true nature of the RICO Defendants' effectively worthless STM products and fraudulent claims-handling practices;

b.     application and registration materials for the RICO Defendants' STM products;

26

       c.      documents to process and receive payment for the RICO Defendants' STM products;

       d.      claims processing materials, including letters requesting medical records and other documentation and Explanation of Benefits ("EOB") forms; and

       e.      other documents and things, including electronic communications.

110.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail the items described above and alleged below:

| From | To | Date | Description |
|---|---|---|---|
| HCC | Plaintiff Bryant and/or his providers | January 2017 – November 2017 | At least 170 letters from HCC's claims department seeking additional, unspecified medical records for the handling of claims and/or informing Plaintiff Bryant that said claims could not be processed, absent said records. |
| HCC | Plaintiff Delgado | July 2016 – January 2018 | Numerous letters from HCC's claims department seeking additional, unspecified medical records for the handling of claims and/or informing Plaintiff Delgado that said claims could not be processed, absent said records. |

111.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals, and sounds, including those items described above and alleged below:

| From | To | Date | Description |
|---|---|---|---|
| HCC | Plaintiff Bryant | January 2017 – Present | Telephone calls from HCC Brand Care Specialists to Plaintiff Bryant facilitating the frustration, and ultimately |

| From | To | Date | Description |
|------|-----|------|-------------|
|  |  |  | improper denial, of Plaintiff Bryant's meritorious claims. |
| Plaintiff Bryant | HCC | January 2017 – Present | Telephone calls from Plaintiff Bryant to HCC Brand Care Specialists resulting in the frustration, and ultimately constructive denial, of Plaintiff Bryant's meritorious claims. |
| HCC | Plaintiff Delgado | July 2016 – January 2018 | Telephone calls from HCC Brand Care Specialists to Plaintiff Delgado facilitating the frustration, and ultimately improper denial, of Plaintiff Delgado's meritorious claims. |
| Plaintiff Delgado | HCC | July 2016 – January 2018 | Telephone calls from Plaintiff Delgado to HCC Brand Care Specialists resulting in the frustration, and ultimately constructive denial, of Plaintiff Delgado's meritorious claims. |

112.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities.  Specifically, the RICO Defendants made misrepresentations about their STM products on their websites and through ads online, all of which were intended to mislead regulators and the public about the quality of their STM products.

113.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive and lure policyholders into purchasing their STM products, which the RICO Defendants knew were effectively worthless.

114.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.  However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.  These include thousands of communications to perpetuate and maintain the scheme, including the

28

things and documents described in the preceding paragraphs.

## C.   The RICO Defendants Operated an Association-in-Fact Enterprise

115.   The RICO Defendants are separate legal entities.  At all relevant times, each of the RICO Defendants has been a "person" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

116.   At all relevant times, the RICO Defendants, along with other individuals and entities, including unknown third parties involved in the marketing, sale, and administration of the RICO Defendants' STMs, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining premiums from policyholders, and through which they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4), as described herein.  The enterprise is called here the "RICO Enterprise."

117.   The association-in-fact RICO Enterprise consisted of at least the following entities and individuals, and likely others:

    a.    RICO Defendant HCC;

    b.    RICO Defendant HII;

    c.    Health Plan Intermediaries, LLC, a Florida limited liability company formed in 2003 and d/b/a/ "Health Insurance Innovations";

    d.    Health Plan Intermediaries Holdings, LLC, a Delaware limited liability company formed in 2012 and d/b/a as "HII";

    e.    Healthpocket, Inc., a Delaware corporation formed in 2012 and a wholly owned subsidiary of HII;

    f.    Global Response Corporation, a Florida company founded in 1974 to provide call center outsourcing services, which, as discussed above, works with HCC to train its "Brand Care Specialists" to obstruct policyholders and delay the payment of validly filed claims; and

    g.    Consumer Benefits of America ("CBA"), a Colorado company founded in 1982 to offer "group buying" discounts to members; the RICO Defendants

issue their STMs to CBA, rather than directly to the policyholders, in states that apply less stringent consumer protection regulations to "group products" than individual products.

118.   At all relevant times, the RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in RICO Defendants' unlawful profit-making scheme.

119.   The RICO Defendants worked together to accomplish their scheme or common course of conduct.  Indeed, the RICO Defendants conduct their business—legitimate and illegitimate—through what they publicly describe as a "partnership."[20]

120.   Each RICO Defendant was employed by or associated with, and conducted or participated in the affairs of the RICO Enterprise:

a.   HCC participated in, operated and/or directed the RICO Enterprise, by, among other things: (i) underwriting the RICO Defendants' STM products; and (ii) processing—and unlawfully delaying and denying—claims validly submitted pursuant to those STM products.

b.   HII participated in, operated and/or directed the RICO Enterprise, by, among other things: (i) acting as the broker through which some Multi-State RICO Class Members purchased the RICO Defendants' STM products; and (ii) administering those STM Products by, among other things, billing Plaintiff Bryant and some Multi-State RICO Class Members through Agile Health Insurance, a division of HII's wholly owned subsidiary HealthPocket, Inc., and operating the patient portal through which policyholders can access information regarding Defendants' STMs.

121.   The CSI has also described the "scheme" through which the RICO Defendants

---

[20] *Id.*

partner to operate the RICO Enterprise.  RICO Defendant HII "solicit[s] insurers to underwrite short term medical and excepted benefit policies, and then organize[s] an extensive operation of insurance producers to sell those policies."  The CSI goes on to explain that HII and its subsidiaries "act[] as, and hold[] themselves out as, administrators for each . . . insurer," including HCC.  Though the policies are underwritten by HCC, the CSI explains that "the HHI entities," including Healthpocket, Inc., "and the individuals behind these entities are the mastermind*s* behind the short term medical policies at issue."

122.    At all relevant times, the RICO Enterprise:  (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including HCC and HII, their subsidiaries, and other entities and individuals associated for the common purpose of selling their effectively worthless STMs to Plaintiffs and Multi-State RICO Class Members.

123.    The RICO Defendants participated in the operation and management of the RICO Enterprise by directing its affairs, as described herein.  While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements

124.    Each participant in the RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the RICO Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues.

125.    Within the RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis.  The RICO Enterprise used this common communication network for the purpose of marketing, selling, and administering their STMs to the general public nationwide, including in each Covered State.

126.   The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the RICO Defendants' and others' hands.

127.   Without the RICO Defendants' willing participation, the RICO Enterprise's scheme and common course of conduct would have been unsuccessful.  Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar fraudulent tactics.

128.   The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein.  Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues for the RICO Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct described herein.

129.   The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

130.   With knowledge and intent, the RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy, and have participated in the common course of conduct, to commit acts of fraud in marketing, selling, and administering their effectively worthless STM products.

**D.   The RICO Enterprise Sought to Increase Defendants' Profits and Revenues**

131.   The RICO Defendants' engaged in their scheme to defraud to increase their revenues and profits.

132.   For example, HII explained in its 2016 10-K that "[r]evenues for the year ended December 31, 2016 were $184.5 million, an increase of $79.8 million, or 76.2%, compared to

32

2015."  HII attributed this growth "primarily" to "continued consumer demand for our affordable healthcare products outside of the ACA open enrollment period and the diversification and enhancement of our distribution system, including . . . AgileHealthInsurance.com."

133.   Similarly, during a March 2, 2015 Investors Conference, Bill Burke (President & COO of HCC Insurance Holdings, Inc.) explained that HCC's "4% growth in gross written premium, which was good" was "driven by our accident and health, which had a 13% increase over the prior year . . . [including] our short-term medical business."

134.   Each member of the RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased revenue generated by the scheme to defraud Plaintiffs and the Multi-State RICO Class Members.

135.   For example, the Montana CSI also described the process by which this profit sharing takes place: "Typically, the insurance premium is paid to the HII entities, which then operate as the plan administrator and divide the premium among the various entities involved."

136.   Plaintiffs' experiences accord with the Montana CSI's observations regarding profit sharing—Plaintiff Bryant was billed by HII via Agile Health Insurance.

**E.**     **Plaintiffs and Class Members Suffered Property Losses**

137.   As a direct and proximate result of their fraudulent scheme and common course of conduct in conducting the RICO Enterprise as described in this Complaint, the RICO Defendants were able to extract premiums from Plaintiffs and the Multi-State RICO Class for effectively worthless insurance policies.

138.   The RICO Defendants knew and intended that policyholders would rely on the material omissions regarding their effectively worthless STM products, would purchase these products, and would incur costs as a result.  Plaintiffs' reliance on this ongoing concealment is demonstrated by the fact that they purchased the RICO Defendants' STM products, which they would not have purchased had they known the true nature of the products.

139.   As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful

33

activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and the Multi-State RICO Class based on their misrepresentations and omissions, while providing STM products that they knew—and intended—would not provide the coverage promised to Plaintiffs and the Multi-State RICO Class. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

140.    As alleged above, the predicate acts had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and the Multi-State RICO Class. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Multi-State RICO Class Members' funds and avoiding the expenses associated with actually processing and paying Plaintiffs' and Multi-State RICO Class Members' valid claims for medical coverage.

141.    By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and the Multi-State RICO Class have been injured in their property in multiple ways, including but not limited to:

   a. out-of-pocket payments for medical coverage that should have been, but was not, covered by the RICO Defendants' STM products; and

   b. other, ongoing out-of-pocket expenses.

142.    The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused economic damage to Plaintiffs' and Multi-State RICO Class Members' property, and Plaintiffs and the Multi-State RICO Class are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**<u>Second Claim for Relief</u>**

**BREACH OF CONTRACT**

**(By Plaintiffs, on Behalf of the Multi-State Breach of Contract Class, Against HCC)**

143.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

144.    Plaintiffs bring this Count against HCC on behalf of the Multi-State Breach of Contract Class under the laws of the Covered States.

145.    The policies that HCC sold Plaintiffs, combined with the timely payment of premiums, amounted to legally enforceable promises and obligations owed via contract.

146.    By accepting the premium payments from Plaintiffs, HCC agreed to timely process, reasonably investigate, and pay claim amounts for certain medical expenses according to the terms of the policies.

147.    In practice, however, HCC fails to abide by their contracts with policyholders. Specifically, HCC employs a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period, and deny policyholder claims based on medical conditions suffered well before the disclosed period, in violation of these contracts.

148.    Moreover, when HCC failed to perform timely process claims and make payments required by the policies, they breached contractual duties owed to Plaintiffs. Specifically, the delays associated with HCC's obstructionist tactics violate its contractual duty to pay benefits as soon as HCC receives a proof of loss form.

149.    HCC's breaches caused damage to Plaintiffs including but not limited to: interest and penalties charged by medical facilities on amounts due and outstanding; costs incurred to force HCC to perform their contractual obligations, make necessary payments, and enforce Plaintiffs' policies; lost time from work as a result of repeated calls to HCC or otherwise attempting to track down information related to Plaintiffs' claims; medical treatments foregone or not pursued because of the fear of denial, incurring more debt, and additional harassment from collection or billing personnel at medical facilities; and interest on the claim amounts that were

improperly denied.

150.     Plaintiffs and Multi-State Breach of Contract Class Members owe monies to certain medical providers for reasons directly and proximately related to HCC's denials, and HCC continues to be in breach of their insurance contracts.

151.     The breaches by HCC have been material, going to the heart of the contract.

152.     All damages sustained by Plaintiffs and Multi-State Breach of Contract Class Members are the result of HCC's breach of obligations owed the Plaintiff and Class Members under the policies they purchased.  Plaintiff and Multi-State Breach of Contract Class Members are entitled to damages, including damages sustained and a refund of premiums.

153.     Under the particular facts alleged in this case, and in light of the clear and uniform breach, among other things, it is appropriate  under choice-of-law principles for Plaintiffs to allege a Mutli-State Breach of Contract Claim.  The essential elements of the law of contract are the same in each Covered State.  The laws of contract as applied to the facts here do not materially differ  and/or differ in ways that matter in this case.  Should the Court determine there exist any relevant differences, grouping is appropriate across the states at issue.

### Third Claim for Relief

**CALIFORNIA UNFAIR COMPETITION LAW ("UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**

**(By Plaintiff Delgado, on Behalf of the California Class, Against Defendants)**

154.     Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

155.     Plaintiff Delgado (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against Defendants on behalf of the California Class.

156.     Defendants' conduct in selling health insurance policies was an unfair, unlawful, and/or fraudulent business practice in violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, *et seq*.

36

157.    The conduct described throughout this complaint took place in the State of California and harmed California consumers.

158.    Defendants' conduct is "unlawful" within the meaning of the UCL because it violates California Insurance Code § 332.  Defendants failed to communicate, in bad faith, material facts within their knowledge that Plaintiff had no means of ascertaining.  These facts include, but are not limited to:  that Defendants employ a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period of six months; that Defendants engage in unlawful post-claims underwriting; that Defendants employ unlawful claims handling procedures, including deliberately preventing policyholders from satisfying burdensome document requirements and training customer service representatives to discourage policyholders from seeking payment or pursuing an appeal; and that Defendants employ the services of unlicensed brokers who use misleading sales tactics.

159.    Defendants' conduct is also "unlawful" within the meaning of the UCL because it violates California Insurance Code § 10384.  Defendants' five-year look-back—through which they seek out medical conditions that would have made the policyholder ineligible for Defendants' insurance in the first place, and use any such condition to justify denial—constitutes "post-claims underwriting," which is squarely prohibited by California Insurance Code § 10384.

160.    Defendants' conduct is also "unfair" and "fraudulent" within the meaning of the UCL.  The unfairness and fraudulence of Defendants' conduct does not depend on whether that conduct is separately unlawful.  Furthermore, Defendants' unlawful acts are not identical to the acts forming the corpus of Defendants' unfair and fraudulent conduct.

161.    Defendants' practices are likely to deceive the public.  A reasonable consumer would be deceived by Defendants' statements and omissions in the selling of HCC health insurance policies—including Defendants' failure to disclose the "five-year look-back" policy— and Plaintiff and members of the California Class have in fact been deceived.

162.    Defendants' practices are unfair, unscrupulous, and injurious to consumers.  They are contrary to the public policy of the State of California, as codified in California Insurance

Code § 330 *et seq.*, California Insurance Code § 10198.7, and California Insurance Code § 790 *et seq.*, as well as of the United States, as codified in the ACA.

163.    Defendants' practices are unfair, and injurious to competition, because they allow Defendants to undercut competitors' prices, and create an incentive for competitors to pursue similarly unscrupulous and deceptive tactics.  The harm to consumers outweighs any utility of Defendants' acts.

164.    Plaintiff has standing to pursue claims under the UCL because money or property was lost as a result of Defendants' unlawful, unfair, and fraudulent business practices.  For instance, as alleged herein, Plaintiff paid money for premiums and received an unlawful and effectively worthless insurance policy in return; in the alternative, Plaintiff paid more for the insurance policies than he would have had the true nature of the policies been disclosed.

165.    Further, Plaintiffs who had claims denied suffered additional injuries in the form of out-of-pocket medical costs incurred due to Defendants' acts.

166.    As a direct and proximate result of Defendants' unfair, unlawful, and/or fraudulent business practices as set forth above, Defendants have been unjustly enriched by Plaintiff and the California Class' payment of consideration in the purchase of their insurance policies.  As such, Plaintiff and the California Class are entitled to restitution of all consideration paid to Defendants under the UCL.

167.    Further, Plaintiff is entitled to an order (i) enjoining the practices complained of herein, and (ii) ordering Defendants to establish a common fund for the payment of medical expenses incurred by Plaintiff and the California Class as a result of Defendants' practices.

**Fourth Claim for Relief**

**CALIFORNIA FALSE ADVERTISING LAW**
**Cal. Bus. & Prof. Code § 17500, *et seq.***

**(By Plaintiff Delgado, on Behalf of the California Class, Against Defendants)**

168.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

169.     Plaintiff Delgado (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against Defendants on behalf of the California Class.

170.     The conduct described throughout this First Amended Class Action Complaint took place in the State of California and harmed California consumers, and constitutes deceptive or false advertising in violation of California's False Advertising Law ("FAL"), California Business & Professions Code § 17500.

171.     The FAL applies to all claims of all California Class Members because the alleged conduct occurred within the State of California.

172.     The FAL prohibits deceptive or misleading practices in connection with advertising or representations made for the purpose of inducing, or which are likely to induce, consumers to purchase products including insurance policies.

173.     Defendants, when they marketed, advertised and sold health insurance policies to Plaintiff and California Class Members, falsely represented to Plaintiff and California Class Members that their insurance policies included a six-month pre-existing condition exclusion, and that all claims would be paid within 30 days of receipt of the proof of loss form.  Defendants also omitted all of the following material information: that Defendants employ a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period of six months; that Defendants engage in unlawful post-claims underwriting; that Defendants employ unlawful claims handling procedures, including deliberately preventing policyholders from satisfying burdensome document requirements and training customer service representatives to discourage policyholders from seeking payment or pursuing an appeal; and that Defendants employ the services of unlicensed brokers who use misleading sales tactics.

174.     At the time of its omissions and/or misrepresentations, Defendants were either aware that their statements were untrue or that they lacked the information and/or knowledge required to make such representations truthfully.

175.     Defendants' descriptions of their insurance policies, claims processes, and customer service practices were false, misleading, and likely to deceive Plaintiff and other

reasonable consumers.  Defendants' conduct therefore constitutes deceptive or misleading advertising.

176.    Plaintiff has standing to pursue claims under the FAL because he reviewed and relied upon Defendants' written and oral statements.

177.    In reliance on the statements made in Defendants' advertising, marketing, or sales, which were ultimately untrue, Plaintiff purchased Defendants' health insurance policies.

178.    Had Defendants' representations regarding their health insurance policies, claims processes, and customer service disclosed their true nature, Plaintiff and California Class Members would not have purchased them.

179.    Defendants' statements in their advertising, marketing, and sales, referenced herein, were part of a scheme or plan by Defendants to sell insurance policies they knew to be inferior to the policies they advertised and promised.

180.    As a direct and proximate result of Defendants' violations of the FAL, Plaintiff and the California Class seek restitution of any monies wrongfully acquired or retained by Defendants by means of their deceptive or misleading representations.

181.    Further, Plaintiff is entitled to an order (i) enjoining the practices complained of herein, and (ii) ordering Defendants to establish a common fund for the payment of medical expenses incurred by Plaintiff and the California Class as a result of Defendants' practices.

**Fifth Claim for Relief**

**BREACH OF CONTRACT**

**(By Plaintiff Delgado, on Behalf of the California Class, Against HCC)**

182.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

183.    Plaintiff Delgado (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against HCC on behalf of the California Class.

184.    The policies that HCC sold Plaintiff, combined with the timely payment of premiums amounted to legally enforceable promises and obligations owed via contract.

185.    By accepting the premium payments from Plaintiff, HCC agreed to timely process, reasonably investigate, and pay claim amounts for certain medical expenses according to the terms of the policies.

186.    In practice, however, HCC fails to abide by their contracts with policyholders. Specifically, HCC employs a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period, and deny policyholder claims based on medical conditions suffered well before the disclosed period, in violation of these contracts.

187.    Moreover, when HCC failed to perform timely process claims and make payments required by the policies, they breached contractual duties owed to Plaintiff. Specifically, the delays associated with HCC's obstructionist tactics violate its contractual duty to pay benefits as soon as HCC receives a proof of loss form.

188.    HCC's breaches caused damage to Plaintiff and/or California Class Members including but not limited to: interest and penalties charged by medical facilities on amounts due and outstanding; costs incurred to force HCC to perform their contractual obligations, make necessary payments, and enforce Plaintiff's policies; lost time from work as a result of repeated calls to HCC or otherwise attempting to track down information related to Plaintiff's claims; medical treatments foregone or not pursued because of the fear of denial, incurring more debt, and additional harassment from collection or billing personnel at medical facilities; and interest on the claim amounts that were improperly denied.

189.    Plaintiff and California Class Members owe monies to certain medical providers for reasons directly and proximately related to HCC's denials, and HCC continues to be in breach of their insurance contracts.

190.    The breaches by HCC have been material, going to the heart of the contract.

191.    All damages sustained by Plaintiff and California Class Members are the result of HCC's breach of obligations owed the Plaintiff and California Class Members under the policies they purchased.  Plaintiff and California Class Members are entitled to damages, including damages sustained and a refund of premiums.

**<u>Sixth Claim for Relief</u>**

**BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**

**(By Plaintiff Delgado, on Behalf of the California Class, Against HCC)**

192.   Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

193.   Plaintiff Delgado (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against HCC on behalf of the California Class.

194.   Through the unlawful "five-year look-back" and unlawful post-claims underwriting—and the attendant, unduly burdensome records requests that arise from those policies, acts, and practices—HCC unreasonably denied Plaintiff coverage for care that was covered under his insurance policy.

195.   Without exclusion, HCC also trained their customer service representatives to consciously mislead, obstruct, and delay Plaintiffs seeking payment of claims.  This claims-handling conduct was a matter of company policy and was without proper cause.

196.   HCC's claims handling practices demonstrate a refusal to cooperate and a denial to Plaintiff of the full benefit of performance.

197.   HCC engaged in a pattern and practice of unreasonably failing to give at least as much consideration to its insureds' interests as it gave its own interests, in the investigation and handling of claims.

198.   HCC has committed institutional bad faith.  HCC's institutional bad faith amounts to reprehensible conduct because the conduct is part of a repeated pattern of unfair practices and not an isolated occurrence.  The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in the established company policies of HCC.

199.   Plaintiff believes and alleges that HCC has breached their duty of good faith and fair dealing by other acts and omissions, of which Plaintiff is presently unaware and which will be shown in the course of discovery.

200.   As a direct and proximate result of the conduct of HCC, Plaintiff and California

42

Class Members have suffered, and will continue to suffer, financial and other consequential damages, for a total amount to be shown at the time of trial.

201. All damages sustained by Plaintiff and California Class Members are the result of HCC's breach of obligations owed the Plaintiff and California Class Members under the policies they purchased. Plaintiff and California Class Members are entitled to damages, including damages sustained and a refund of premiums.

## Seventh Claim for Relief

### FRAUD

### (By Plaintiff Delgado, on Behalf of the California Class, Against Defendants)

202. Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

203. Plaintiff Delgado (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against Defendants on behalf of the California Class.

204. Defendants' conduct in selling health insurance policies was fraudulent. This conduct took place in the State of California and harmed California consumers.

205. In the course of marketing, selling, and administering their STMs, Defendants made false statements of material fact to Plaintiff, concealed true facts from Plaintiff, and made false promises to Plaintiff about the quality of their insurance products.

206. Defendants promised Plaintiff and other California Class members that they would provide short-term medical insurance with a pre-existing condition exclusion of six months and that they would promptly pay any claims arising during the period of coverage in a period as short as one month.

207. Defendant made these promises—which are material because they go to the heart of the agreement reached between Defendants and Plaintiff—without any intention of performing the promises.

208. Instead, Defendants intentionally failed to communicate and concealed material facts within their knowledge that Plaintiff had no means of ascertaining. These facts include but

are not limited to:  that Defendants employ a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period of six months; that Defendants engage in unlawful post-claims underwriting; that Defendants employ unlawful claims handling procedures, including deliberately preventing policyholders from satisfying burdensome document requirements and training customer service representatives to discourage policyholders from seeking payment or pursuing an appeal; and that Defendants employ the services of unlicensed brokers who use misleading sales tactics.

209.    When Defendants made these misrepresentations and omissions, Defendants knew they were false and misleading.  To conceal the true nature of their insurance products, Defendants suppressed these material facts by telling Plaintiff other facts, such as those contained in the promises above, in order to mislead Plaintiff and prevent Plaintiff from discovering the true facts.

210.    Defendants made these misrepresentations and made false promises with the intent to defraud and induce Plaintiff to purchase an HCC insurance policy.  At the time Plaintiff acted, Plaintiff did not know Defendants' misrepresentations and omissions were false and believed they were true.

211.    Plaintiff acted in justifiable reliance upon the truth of Defendants' representations and promises.

212.    Defendants' practices are likely to deceive the public.  A reasonable consumer would be deceived by Defendants' statements and omissions in the selling of HCC health insurance policies—including Defendants' failure to disclose the "five-year look-back" policy— and Plaintiff and members of the California Class have in fact been deceived.

213.    HCC's misrepresentations, concealment, and false promises caused damage to Plaintiff and/or California Class Members including but not limited to: interest and penalties charged by medical facilities on amounts due and outstanding; costs incurred to force HCC to perform their contractual obligations, make necessary payments, and enforce Plaintiff's policies; lost time from work as a result of repeated calls to HCC or otherwise attempting to track down

information related to Plaintiff's claims; medical treatments foregone or not pursued because of the fear of denial, incurring more debt, and additional harassment from collection or billing personnel at medical facilities; and interest on the claim amounts that were improperly denied.

### Eighth Claim for Relief

**SOUTH DAKOTA DECEPTIVE TRADE PRACTICES & CONSUMER PROTECTION ACT
SDCL §§ 37-24-1 *et seq.***

**(By Plaintiff Bryant, on Behalf of the South Dakota Class, Against Defendants)**

214. Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

215. Plaintiff Bryant (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against Defendants on behalf of the South Dakota Class.

216. At all relevant times, Plaintiff has been entitled to the rights, protections, and benefits of the South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL §§ 37-24-1 *et seq.*, and other South Dakota law.

217. Defendants' violations caused loss of Plaintiff's and South Dakota Class Members' money and property.

218. Plaintiff and South Dakota Class Members suffered additional injuries in the form of out-of-pocket medical costs incurred due to Defendants' acts.

219. The conduct described throughout this complaint took place in the State of South Dakota and harmed South Dakota consumers.

220. The conduct by Defendants described herein constitutes, without limitation:

    a.    knowingly acting, using, or employing a deceptive act or practice, fraud, false pretense, false promises, or misrepresentation; and/or

    b.    concealing, suppressing, or omitting material facts in connection with the sale or advertisement of a service.

221. Defendants failed to communicate, in bad faith, material facts within their knowledge that Plaintiff had no means of ascertaining. These facts include, but are not limited

to: that Defendants employ a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period; that Defendants engage in unlawful post-claims underwriting; that Defendants employ unlawful claims handling procedures, including deliberately preventing policyholders from satisfying burdensome document requirements and training customer service representatives to discourage policyholders from seeking payment or pursuing an appeal; and that Defendants employ the services of unlicensed brokers who use misleading sales tactics.

222.    Defendants' practices are likely to deceive the public.  A reasonable consumer would be deceived by Defendants' statements and omissions in the selling of HCC's short-term health insurance policies—including Defendants' failure to disclose the "five-year look-back" policy—and Plaintiff and members of the South Dakota Class have in fact been deceived. Injuries will continue to accrue if Defendants do not abate their conduct.

223.    Plaintiff and South Dakota Class Members justifiably relied upon Defendants' misstatements and omissions.

224.    Defendants' practices are unfair, unscrupulous, and injurious to consumers.  They are contrary to the public policy of the State of South Dakota, as embodied in SDCL § 37-24-6, SDCL §§ 58-12-31 *et seq.*, and SDCL §§ 58-33-66 *et seq.*, as well as of the United States, as codified in the ACA.

225.    Defendants' practices are unfair, and injurious to competition, because they allow Defendants to undercut competitors' prices, and create an incentive for competitors to pursue similarly unscrupulous and deceptive tactics.

226.    Defendants' practices are likely to cause, and do cause, substantial injuries to consumers, which are not outweighed by a countervailing benefit to consumers or competition. Such injuries cannot reasonably be avoided by consumers.

227.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices as set forth above, Defendants have been unjustly enriched by Plaintiff's payment of consideration in the purchase of their insurance policies.

228.    Accordingly, Plaintiff is entitled to an order (i) enjoining the practices complained of herein, (ii) actual damages suffered as a result of Defendants' deceptive acts and practices, and (iii) other relief that the Court may find just and proper.

### Ninth Claim for Relief

### INSURANCE BAD FAITH

**(By Plaintiff Bryant, on Behalf of the South Dakota Class, Against Defendants)**

229.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

230.    Plaintiff Bryant (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against Defendants on behalf of the South Dakota Class.

231.    Defendants have acted in bad faith toward Plaintiff, thereby committing the tort of insurance bad faith.  Defendants acts of bad faith, described throughout this complaint, include but are not limited to:

a.      denying or constructively denying claims without a reasonable basis;

b.      knowingly or recklessly disregarding the lack of a reasonable basis for such denials;

c.      knowingly or recklessly failing to conduct a reasonable investigation concerning each claim; and

d.      consciously engaging in wrongdoing during the processing of claims.

232.    On information and belief, Defendants' bad faith practices are committed with such frequency as to indicate a business practice.

233.    Accordingly, Plaintiff seeks recovery of damages with interest, an award of punitive damages, costs, and attorneys' fees.

### Tenth Claim for Relief

### BREACH OF CONTRACT

**(By Plaintiff Bryant, on Behalf of the South Dakota Class, Against HCC)**

234.    Plaintiffs re-allege each of the allegations above and below as if fully set forth

here.

235.     Plaintiff Bryant (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against HCC on behalf of the South Dakota Class.

236.     The policies that HCC sold Plaintiff, combined with the timely payment of premiums amounted to legally enforceable promises and obligations owed via contract.

237.     By accepting the premium payments from Plaintiff, HCC agreed to timely process, reasonably investigate, and pay claim amounts for certain medical expenses according to the terms of the policies.

238.     In practice, however, HCC fails to abide by their contracts with policyholders. Specifically, HCC employs a "five-year look-back" to effectively extend their pre-existing conditions exclusion well beyond the contracted-to period, and deny policyholder claims based on medical conditions suffered well before the disclosed period, in violation of these contracts.

239.     Moreover, when HCC failed to perform timely process claims and make payments required by the policies, they breached contractual duties owed to Plaintiff. Specifically, the delays associated with HCC's obstructionist tactics violate its contractual duty to pay benefits as soon as HCC receives a proof of loss form.

240.     HCC's breaches caused damage to Plaintiff and/or South Dakota Class Members including but not limited to: interest and penalties charged by medical facilities on amounts due and outstanding; costs incurred to force HCC to perform their contractual obligations, make necessary payments, and enforce Plaintiff's policies; lost time from work as a result of repeated calls to HCC or otherwise attempting to track down information related to Plaintiff's claims; medical treatments foregone or not pursued because of the fear of denial, incurring more debt, and additional harassment from collection or billing personnel at medical facilities; and interest on the claim amounts that were improperly denied.

241.     Plaintiff and South Dakota Class Members owe monies to certain medical providers for reasons directly and proximately related to HCC's denials, and HCC continues to be in breach of their insurance contracts.

242.    The breaches by HCC have been material, going to the heart of the contract.

243.    All damages sustained by Plaintiff and South Dakota Class Members are the result of HCC's breach of obligations owed the Plaintiff and South Dakota Class Members under the policies they purchased.  Plaintiff and South Dakota Class Members are entitled to damages, including damages sustained and a refund of premiums.

## Eleventh Claim for Relief

## BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

### (By Plaintiff Bryant, on Behalf of the South Dakota Class, Against HCC)

244.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

245.    Plaintiff Bryant (for the purposes of this Claim for Relief, "Plaintiff") brings this Claim for Relief against HCC on behalf of the South Dakota Class.

246.    Through the unlawful "five-year look-back" and unlawful post-claims underwriting—and the attendant, unduly burdensome records requests that arise from those policies, acts, and practices—HCC unreasonably denied Plaintiff coverage for care that was covered under his insurance policy.

247.    Without exclusion, HCC also trained their customer service representatives to consciously mislead, obstruct, and delay Plaintiffs seeking payment of claims.  This claims-handling conduct was a matter of company policy and was without proper cause.

248.    HCC's claims handling practices demonstrate a refusal to cooperate and a denial to Plaintiff of the full benefit of performance.

249.    HCC engaged in a pattern and practice of unreasonably failing to give at least as much consideration to its insureds' interests as it gave its own interests, in the investigation and handling of claims.

250.    HCC has committed institutional bad faith.  HCC's institutional bad faith amounts to reprehensible conduct because the conduct is part of a repeated pattern of unfair practices and not an isolated occurrence.  The pattern of unfair practices constitutes a conscious course of

wrongful conduct that is firmly grounded in the established company policies of HCC.

251.    Plaintiff believes and alleges that HCC has breached their duty of good faith and fair dealing by other acts and omissions, of which Plaintiff is presently unaware and which will be shown in the course of discovery.

252.    As a direct and proximate result of the conduct of HCC, Plaintiff and South Dakota Class Members have suffered, and will continue to suffer, financial and other consequential damages, for a total amount to be shown at the time of trial.

253.    All damages sustained by Plaintiff and South Dakota Class Members are the result of HCC's breach of obligations owed the Plaintiff and South Dakota Class Members under the policies they purchased.  Plaintiff and South Dakota Class Members are entitled to damages, including damages sustained and a refund of premiums.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of the Class, pray for judgment and relief against Defendants as follows:

A.    For an order certifying the case as a class action and appointing Plaintiffs and Plaintiffs' counsel to represent the Class;

B.    For an order awarding, as appropriate, damages to Plaintiffs and Class Members, including all monetary relief to which Plaintiffs and Class Members are entitled under the applicable law;

C.    For an order requiring Defendants to immediately cease and desist their unlawful, deceptive, and obstructive practices with respect to the sales, claims processing, and customer service connected with their health insurance policies;

D.    For an order requiring Defendants to establish a common fund for the payment of medical expenses and incidental damages incurred by Plaintiffs and the Class as a result of their practices;

E.    For an order awarding attorneys' fees and costs;

F.    For an order awarding treble damages;

G.    For an order awarding pre-judgment and post-judgment interest; and

H.    For an order providing such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: March 23, 2018

COHEN & MALAD, LLP

s/Vess A. Miller
Irwin B. Levin (No. 8786-49)
ilevin@cohenandmalad.com
Richard E. Shevitz (No. 12007-49)
rshevitz@cohenandmalad.com
Vess A. Miller (No. 26495-53)
vmiller@cohenandmalad.com
Lynn Toops (No. 26386-49A)
ltoops@cohenandmalad.com
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Rachel Geman (*pro hac vice*)
rgeman@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013-1413
(212) 355-9500

Elizabeth J. Cabraser
ecabraser@lchb.com
Michelle A. Lamy (*pro hac vice*)
mlamy@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
(415) 956-1000

CARNEY BATES & PULLIAM, PLLC
Allen Carney
acarney@cbplaw.com
David Slade (*pro hac vice*)
dslade@cbplaw.com
519 W. 7th Street
Little Rock, AR  72201
(501) 312-8500

CUNEO GILBERT & LADUCA, LLP
Michael J. Flannery (*pro hac vice*)

51

mflannery@cuneolaw.com
7733 Forsyth Boulevard, Suite 1675
Clayton, MO 63105
(314) 226-1015

Katherine Van Dyck (*pro hac vice*)
kvandyck@cuneolaw.com
4725 Wisconsin Ave, NW, Suite 200
Washington, D.C. 20016
(202) 789-3960

MEHRI & SKALET
Jay Angoff (*pro hac vice*)
jay.angoff@findjustice.com
1250 Connecticut Avenue, NW, Suite 300
Washington, D.C. 20036
(202) 822-5100

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2018, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the court's system.

s/Vess A. Miller_____
Vess A. Miller

COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
vmiller@cohenandmalad.com